UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DANABY RENTALS, INC.,<br><br>                    Plaintiff,<br><br>        -against-<br><br>MT. HAWLEY INSURANCE COMPANY,<br><br>                    Defendants. | 24-CV-03481 (JPC) (RFT)<br><br>**<u>OPINION & ORDER</u>** |

**ROBYN F. TARNOFSKY, United States Magistrate Judge:**

Pending before the Court are the fully briefed cross-motions under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and Rule 37 of the Federal Rules of Civil Procedure to exclude certain expert testimony proffered by Plaintiff Danaby Rentals, Inc. and Defendant Mt. Hawley Insurance Co. (*See* ECF 75, Def.'s Mot. To Exclude; ECF 78, Pl.'s Mot. To Exclude.) Defendant has moved to exclude the testimony of David Poynor, Plaintiff's retained expert, and Cord Largo, Plaintiff's non-retained expert; Plaintiff has moved to exclude the testimony of Stewart Verhulst, Defendant's retained expert, and Rodgers Truitt, Defendant's non-retained expert. (*See* ECF 76, Def.'s Mem. in Supp. of Mot. To Exclude ("Def.'s *Daubert* Mem.") at 8-13; ECF 79, Pl.'s Mem. in Supp. of Mot. To Exclude ("Pl.'s *Daubert* Mem.") at 10-15.) The parties provided the expert testimony in connection with Plaintiff's motion for partial summary judgment (ECF 64) on Defendant's affirmative defenses to Plaintiff's claims for breach of contract, violation of Texas insurance statutes, and attorney's fees, which arise out of Defendant's denial of insurance coverage for damage to certain real estate (the "Insured Properties") following a hailstorm; and in connection with Defendant's cross-motion for

summary judgment on Plaintiff's claims (ECF 67). The cross-motions for summary judgment are fully briefed and pending before the Honorable John. P. Cronan.

For the reasons that follow, Plaintiff's motion to exclude Verhulst's report and testimony is GRANTED IN PART, in that Verhulst may not testify about the causes of the interior water damage at one of the Insured Properties (Location 10, defined below), and is otherwise DENIED IN PART; Plaintiff's motion to exclude Truitt's report and testimony is GRANTED IN PART, in that Truitt may not to testify about the scope of damage to the Insured Properties, and is otherwise DENIED IN PART; Defendant's motion to exclude Largo's report and testimony is GRANTED IN PART, in that Largo may testify about the causes of the interior water damage to the Insured Properties, and is otherwise DENIED IN PART; and Defendant's motion to exclude Poynor's report and testimony is DENIED.[1]

### FACTUAL BACKGROUND

I draw this factual background from the filings in connection with the pending cross-motions for summary judgment, including the statements of material fact ("SUMF") and counterstatements of material fact ("CSUMF"). *See*, *e.g., Am. Empire Surplus Lines Ins. Co. v. J.R. Contracting & Env't Consulting, Inc.*, 743 F. Supp. 3d 530, 533 (S.D.N.Y. 2024) (citing to declarations, complaint, and insurance policy); *Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 345 n.1 (S.D.N.Y. 2023) (deciding a *Daubert* motion based on facts from a SUMF);

---

[1]     "Because Daubert motions are nondispositive of the litigation, they are routinely determined by magistrate judges, subject to clear error review by the district judge." *DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, No. 17-CV-4576 (DEH) (BCM), 2024 WL 1115944, at *3 n.4 (S.D.N.Y. Mar. 14, 2024); *see also Am. Empire Surplus Lines Ins. Co. v. J.R. Contracting & Env't Consulting, Inc.*, 743 F. Supp. 3d 530, 533 n.1 (S.D.N.Y. 2024).

*LoanCare, LLC v. Dimont & Assocs., LLC*, No. 22-CV-9286 (MMG), 2025 WL 951585, at *1 n.1 (S.D.N.Y. Mar. 28, 2025) (same).

Plaintiff is a Texas-based entity that owns and manages commercial real estate. (*See* ECF 90, Pl.'s CSUMF ¶ 1.) Plaintiff had a contract with Defendant for commercial property insurance for the period from August 30, 2022 to August 30, 2023 (the "Policy"). (*See Id.*) The Policy, which had an insurance limit of $8,613,200.00 and a deductible of $25,000.00, covered the Insured Properties, which consist of ten commercial properties in Edinburg and Pharrm, Texas (each location is designated by a location number from one to ten). (*See id.* ¶¶ 1-2, 10.)[2]

On April 28, 2023, a hailstorm struck the Insured Properties. (*See* ECF 95, Def.'s Resp. To Pl.'s Statement of Additional Material Facts ("Def.'s Additional CSUMF Resp.") at 1.) Immediately following the storm, Plaintiff received widespread leak complaints from tenants, although the parties dispute the extent to which those complaints were related to the storm and whether they allowed Plaintiff to discover that the storm had damaged the Insured Properties. (*See* ECF 90, Pl.'s CSUMF ¶¶ 14-17.) Plaintiff initiated roofing work immediately after the storm struck; the parties dispute whether the repairs addressed damage from the storm. (*See id.* ¶ 17.)

---

[2]    The Insured Properties are: 3201-3329 Alberta Rd., Edinburg, Texas 78539 ("Location 1"); 3301-3329 Alberta Rd., Edinburg, Texas 78539 ("Location 2"); 3401-3423 Alberta Rd., Edinburg, Texas 78539 ("Location 3"); 3501-3523 Alberta Rd., Edinburg, Texas 78539 ("Location 4"); 3601-3625 Alberta Rd., Edinburg, Texas 78539 ("Location 5"); 940 West Nolana Loop, Pharr, Texas 78577 ("Location 6"); 944-946 West Nolana Loop, Pharr, Texas 78577 ("Location 7"); 950 A-C West Nolana Loop, Pharr, Texas 78577 ("Location 8"); 500-512 West Canton Road, Edinburg, Texas 78539 ("Location 9"); 600 West Canton Road, Edinburg, Texas 78539 ("Location 10"). (ECF 85, Def.'s CSUMF ¶ 4.)

In July 2023, Largo, a licensed public adjuster who worked for Under Paid Claim, LLC, which rented space at one of the Insured Properties, observed leaks in his office. (*See* ECF 95, Def.'s Additional CSUMF Resp. at 7.)[3] He notified Daniel Sandoval – Plaintiff's owner and corporate representative – about the leaks. (*See id.*) At Sandoval's request, Largo conducted a full inspection of the Insured Properties. (*See* ECF 85, Def.'s CSUMF ¶ 6.)

By emails dated August 3, 4, and 7, 2023, Under Paid Claim filed a claim with Defendant for damage to the Insured Properties reportedly caused by the April 28, 2023 storm. (*See* ECF 90, Pl.'s CSUMF ¶ 5.) Defendant acknowledged the receipt of the claim on August 4, 2023 and hired Truitt, an independent adjuster, to investigate the claim (*See id.* ¶¶ 6-7.) Truitt conducted his inspection from August 16 to 18, 2023 and provided Defendant with a report dated August 22, 2023, along with his statement of loss, damage estimate, building valuation, post-inspection letter to the insured, and photographs taken during his investigation. (*See id.* ¶¶ 7-8.) Truitt estimated that the covered loss for wind and hail damage to the exterior of the Insured Properties amounted to $2,730.22. (*See* ECF 85, Def.'s CSUMF ¶ 10; *see also* ECF 80-4 Report of Rodgers Truitt ("Truitt Report").) On August 25, 2023, Defendant sent a letter to Under Paid Claim, conveying its "partial declination" and reservation of rights. (ECF 90, Pl.'s CSUMF ¶ 8.) Defendant referenced various provisions of the Policy applicable to the claimed loss, including the section requiring the insured to give Defendant prompt notice of any loss or damage, as well as Truitt's findings that (1) the damage attributable to the storm was below the Policy deductible, and (2) that there was "no evidence of any wind or hail damage to the multiple

---

[3]    A public adjuster is a licensed insurance professional who helps policyholders to identify the scope of damages and file any covered damage claims. (ECF 90. Pl.'s CSUMF ¶ 5.)

roofing systems of the buildings that would have allowed the observed water intrusion into the interiors of the various office spaces." (*Id.*; *see also* ECF 80-3, First Denial Letter; ECF 80-4, Truitt Report at 2.)

In or around September 2023, Under Paid Claim provided Defendant with an estimate of the cost of replacing all roofs and rooftop HVAC units on the Insured Properties and of repairing the interior water damage. (*See* ECF 89-2, Largo Dep. Tr. at 63:22-6 5:12; ECF 90, Pl.'s CSUMF ¶ 9.) The estimate showed that the cost of restoring Locations 1 to 5 to their pre-loss condition was $1,321,802.60 and that the cost for Locations 6 to 10 was $582,313.58, for a total cost of $1,904,116.18. (*See* ECF 85, Def.'s CSUMF ¶¶ 17-18.)

After receiving Under Paid Claim's estimate, Defendant hired Verhulst to further inspect the Insured Properties. (*See id.*) Verhulst conducted his investigation on November 6 and 7, 2023 and issued a report dated January 5, 2024 and a supplemental report dated January 17, 2024. (*See* ECF 84, Declaration of Stewart Verhulst ("Verhulst Decl.") ¶ 4; ECF 84-2, Reports of Stewart Verhulst ("Verhulst Reports") at 2, 5, 103.) Based on Verhulst's two reports, Truitt prepared a revised estimate of damage reflecting a replacement cost of $33,510.35, a revised statement of loss, and coinsurance requirement calculations. (*See* ECF 90, Pl.'s CSUMF ¶ 10; ECF 85, Def.'s CSUMF ¶ 22).[4]

---

[4]     The Policy's coinsurance provision states that Defendant will not pay the full amount of any loss if the value of the Insured Properties at "the time of loss" times the coinsurance percentage is greater than the limit of insurance for the property. The actual payment would be the lesser of coinsurance, derived based on Defendant's calculation methodology, or the limit of insurance. (*See* ECF 6-1, Policy Statement at 21.)

On December 30, 2023, Plaintiff delivered a pre-suit notice to Defendant. (*See* ECF 73-8, Jan. 26, 2024 Letter.) On January 26, 2024, Defendant replied to the notice and referenced its additional investigation and the conclusions of Verhulst and Truitt. (*See id.*; ECF 90, Pl.'s CSUMF ¶ 11.) Based on the coinsurance provision, depreciation, and the deductible, Defendant issued no payment to Plaintiff. (*See* ECF 85, Def.'s CSUMF ¶ 24.) Plaintiff retained Poynor to further investigate the cost of repairing and replacing reportedly storm-damaged items at the Insured Properties. Poynor conducted his inspection on September 24 and 25, 2024. (*See* ECF 89-4, Report of David Poyner ("Poyner Report") at 2.)

### PROCEDURAL HISTORY

On March 12, 2024, Plaintiff filed a complaint in the Southern District of Texas, asserting a claim for breach of the Policy. (*See* ECF 90, Pl.'s CSUMF ¶¶ 12-13.) Defendant answered the complaint on Aprill 11, 2024, asserting, among other affirmative defenses, late notice and cosmetic damage. (*See Id.* ¶ 13; ECF 85, Def.'s CSUMF ¶ 27.)[5] On May 6, 2024, Judge Peter Bray of the Southern District of Texas granted Defendant's unopposed motion to transfer venue to this Court pursuant to 28 U.S.C. § 1404(a). (*See* ECF 10, Order To Transfer at 1.) The case was referred to me on May 15, 2024 for general pretrial supervision and non-dispositive motions. (*See* ECF 21, Order of Ref. at 1.)

---

[5]     The Policy requires Plaintiff to give Defendant "prompt" notice of loss or damage caused by windstorm or hail, and in no event could a claim be filed with Defendant later than one year after the date of such loss or damage. (ECF 6-1, Policy Statement at 86.) The Policy also denies coverage for cosmetic damage to roof surfacing caused by wind or hail. (*See id.* at 80.) "Cosmetic damage means that the wind and/or hail caused marring, pitting or other superficial damage that altered the appearance of the roof surfacing, but such damage does not prevent the roof from continuing to function as a barrier to entrance of the elements to the same extent as it did before the cosmetic damage occurred." (*Id.*)

The parties requested extensions of the discovery deadline so to complete expert discovery. (*See* ECF 44, March 5, 2025 Joint Letter; ECF 46, March 24, 2025 Joint Letter.) Plaintiff's experts Largo and Poynor, were deposed on April 24, 2025 and April 30, 2025, respectively. (*See* ECF 89-2, Largo Tr. at 1; ECF 89-3, Poynor Tr. at 1.) The depositions of Defendant's experts, Truitt and Verhulst, were originally scheduled for May 5, 2025 and May 13, 2025. (*See* ECF 46, March 24, 2025 Joint Letter.) Plaintiff cancelled both depositions and did not reschedule them. (*See* ECF 86, Def.'s Opp. at 3.) Discovery closed on May 13, 2025. (*See* ECF 47, Order.)

On June 20, 2025, Plaintiff moved for partial summary judgment on Defendant's affirmative defenses, and Defendant moved for summary judgement on Plaintiff's claims. (*See* ECF 64, Pl.'s S.J. Mot.; ECF 67, Def.'s S.J. Mot.) The parties supported their respective summary judgment motions and oppositions thereto with, among other materials, the testimony of Plaintiff's experts, Poynor and Largo and of Defendants' experts, Verhulst and Truitt. (*See* ECF 80-5, Largo Report Part 1; ECF 80-6, Largo Report Part 2; ECF 83, Decl. of Rodgers Truitt in Opp. to Summ. J. ("Truitt S.J. Decl.") (attaching exhibits); ECF 84, Decl. of Stewart Verhulst in Opp. of Summ. J. ("Verhulst S.J. Decl."); ECF 84-2, Verhulst Reports; ECF 89-4, Poyner Report.)

Plaintiff and Defendant each filed a cross-motion to exclude or limit the opposing party's expert testimony. (*See* ECF 75, Def.'s Mot. To Exclude; ECF 78, Pl.'s Mot. To Exclude.) Those cross-motions were fully briefed by July 18, 2025. In support of its motion to exclude, Defendant filed a memorandum of law as well as, among other materials, Plaintiff's expert disclosures, and an attorney declaration attaching exhibits, including a copy of Plaintiff's Rule 26(a)(2) Expert Disclosures, Poyner's September 2024 Report, and excerpts from the Largo and

Poyner depositions. (*See* ECF 76, Def.'s *Daubert* Mem.; ECF 77.) In support of its motion to exclude, Plaintiff filed a memorandum of law (ECF 79) along with, among other materials, the Truitt Report, the Verhulst Reports, and attorney declarations attaching exhibits. (*See* ECF 80, ECF 81.)

Defendant's opposition to Plaintiff's motion to exclude included a brief and an attorney declaration attaching exhibits. (*See* ECF 86, Def.'s Mem. in Opp. of Mot. To Exclude ("Def.'s *Daubert* Opp."); ECF 87.) Plaintiff's opposition to Defendant's motion to exclude likewise included a brief and an attorney declaration attaching exhibits. (*See* ECF 88, Pl.'s Mem. in Opp. of Mot. To Exclude ("Pl.'s *Daubert* Opp."); ECF 89.) Each party filed a reply brief in further support of its *Daubert* motion. (*See* ECF 93, Def.'s Reply Mem. in Supp. of Mot. To Exclude ("Def.'s *Daubert* Reply"); ECF 96, Pl.'s Reply Mem. in Supp. of Mot. to Exclude ("Pl.'s *Daubert* Reply").)

## LEGAL STANDARDS GOVERNING *DAUBERT* MOTIONS

Trial courts serve as gatekeepers for expert evidence and are responsible for "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597.[6] "The party seeking to introduce the expert testimony bears the burden of establishing by a preponderance of the evidence that the proffered testimony is admissible." *Sec. & Exch. Comm'n v. Yorkville Advisors, LLC*, 305 F. Supp. 3d 486, 503-04 (S.D.N.Y. 2018) (citing *Daubert*, 509 U.S. at 592). Although a district court has "broad discretion to carry out this gatekeeping function," *Navigators Ins. Co. v. Goyard, Inc.*, 608 F. Supp. 3d 44,

---

[6]     Unless otherwise indicated, this opinion and order omits internal quotation marks, alterations, and citations from quoted text.

47 (S.D.N.Y. 2022), "exclusion remains the exception rather than the rule." *In re AXA Equitable Life Ins. Co. COI Litig.*, 595 F. Supp. 3d 196, 250 (S.D.N.Y. 2022), *on reconsideration in part*, No. 16-CV-0740 (JMF), 2022 WL 3018104 (S.D.N.Y. July 29, 2022).

Under Rule 702 of the Federal Rules of Evidence, which governs the admissibility of expert and other scientific or technical testimony or testimony based on specialized knowledge:

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Rule 702 requires that "expert testimony rest on knowledge, a term that connotes more than subjective belief or unsupported speculation." *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 543 (S.D.N.Y. 2004) (quoting *Daubert*, 509 U.S. at 590). In assessing the admissibility of expert testimony under Rule 702, courts consider three factors: "(1) the qualifications of the expert to testify as to a particular matter, (2) the reliability of the methodology and underlying data employed by the expert, and (3) the relevance of the expert's testimony (*i.e.*, whether the expert's testimony as to a particular matter will assist the trier of fact)." *Bocoum v. Daimler Trucks N. Am. LLC*, No. 17-CV-7636 (JPC) (BCM), 2022 WL 902465, at *6 (S.D.N.Y. Mar. 28, 2022) (quoting *Nimely v. City of New York*, 414 F.3d 381, 396-97 (2d Cir. 2005)).

## I.    Expert Qualifications

"To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004). "If an expert's training and experience are in a field closely related to the subject matter of the proposed testimony, that showing may be sufficient to meet Rule 702's qualification standards in appropriate circumstances." *In re M/V MSC FLAMINIA*, No. 12-CV-8892 (KBF), 2017 WL 3208598, at *4 (S.D.N.Y. July 28, 2017).

## II.    Reliability of the Expert's Opinion

After concluding that a witness is qualified as an expert, a court then examines whether "the expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 305 (S.D.N.Y. 2015) (quoting *Daubert*, 509 U.S. at 597). "If the expert's testimony does not rest on traditional scientific methods, the court may permit testimony where a proposed expert witness bases her testimony on practical experience rather than scientific analysis." *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 43 (S.D.N.Y. 2016).

"An expert opinion requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion." *Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006). Expert opinions should be excluded when the flaw in the expert's reasoning or methodology is "large enough that the expert lacks good grounds for his or her conclusions." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002); *see also In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 284 (E.D.N.Y. 2007)

("Subjective methodology, as well as testimony that is insufficiently connected to the facts of the case, have been relied upon by appellate courts as grounds for rejection of expert testimony."). Courts "must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached." *Amorgianos*, 303 F.3d at 266. Nonetheless, "conclusions and methodology are not entirely distinct from one another"; "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert," and a court may exclude expert testimony if it determines that "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

"As the Second Circuit has noted, district courts should presume expert evidence is reliable." *UMG Recordings, Inc. v. Lindor*, 531 F. Supp. 2d 453, 456 (E.D.N.Y. 2007) (citing *Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995)). "[D]oubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility . . . ." *In re Zyprexa*, 489 F. Supp. 2d at 285 (quoting *United States v. Jakobetz*, 955 F.2d 786, 797 (2d Cir. 1992)).

## III.    Relevance of the Expert's Opinion

The third prong of a Rule 702 analysis asks whether the expert's testimony "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a); *see also Washington,* 105 F. Supp. 3d at 307-08. This prong requires an assessment of whether the testimony is relevant to the issues in the case. *See, e.g.*, *Daubert*, 509 U.S. at 591 (explaining that the third prong "goes primarily to relevance"). Under Rule 401 of the Federal Rules of

Evidence, evidence is relevant if it has a "tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401.

In deciding whether expert testimony will be helpful to the factfinders, the Court must assess whether the testimony "usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999); *see also United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) ("[E]xpert testimony may help a jury understand unfamiliar terms and concepts," but "[i]ts use must be carefully circumscribed . . . . "). While an expert "may opine on an issue of fact within the jury's province," an expert "may not give testimony stating ultimate legal conclusions based on those facts." *Bilzerian*, 926 F.2d at 1294; *see also Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992) ("This circuit is in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion.").

Courts, therefore, exclude expert testimony that "provide[s] legal opinions, legal conclusions, or interpret[s] legal terms; those roles fall solely within the province of the court." *Highland Cap. Mgmt. L.P. v. Schneider*, 379 F. Supp. 2d 461, 470 (S.D.N.Y. 2005). Courts also exclude expert testimony that "supplant[s] the role of counsel in making argument at trial, and the role of the jury [in] interpreting the evidence." *Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 529 (S.D.N.Y. 2001), a*brogated on other grounds by Casey v. Merck & Co.*, 653 F.3d 95 (2d Cir. 2011); *see also LinkCo, Inc. v. Fujitsu Ltd.*, No. 00-CV-7242 (SAS), 2002 WL 1585551, at *2 (S.D.N.Y. July 16, 2002) (rejecting an expert's report that "d[id] no more than counsel for the plaintiff w[ould] do in argument, i.e., propound a particular interpretation of [the] defendant's conduct"); *Scott*, 315 F.R.D. at 45-46, 49 (finding that experts are not

12

permitted to testify about the parties' motivations or intentions or to state ultimate legal conclusions).

### IV.    Federal Rules of Civil Procedure 26 and 37

Rule 26 of the Federal Rules of Civil Procedure requires that "a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." Fed. R. Civ. Proc. 26(a)(2)(A). Rule 26 distinguishes between retained expert witnesses, *see id.* 26(a)(2(B), and non-retained expert witnesses, *see id.* 26(a)(2)(C), and provides separate disclosure rules for each category. Retained expert witnesses are experts who have been "retained for the purposes of trial" and "who form their opinion based on knowledge acquired or developed in anticipation of litigation or for trial," *Shelper v. Metro-North Commuter R.R.*, No. 13-CV-7192 (RWS), 2016 WL 1532251, at *2 (S.D.N.Y. April 15, 2016), whereas non-retained experts are "percipient witnesses who also are asked to provide[ ]opinions." *Ayotte v. Nat'l Basketball Ass'n*, No. 22-CV-9666 (VSB) (RWL) 2024 WL 3409027, at * 1 (S.D.N.Y. Jul. 15, 2024); *see also Caruso v. Bon Secours Charity Health Sys., Inc.*, 703 F. App's 31, 33 (2d Cir. 2017) (describing the distinction between retained and non-retained experts witnesses as "an expert who happened to have personal involvement with the events giving rise to litigation and an expert whose only involvement consists of aiding the already-initiated litigation").

If the witness has been "retained or specially employed to provide expert testimony," he must provide a written report containing:

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; (iii) any exhibits that will be used to summarize or support them; (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;

13

(v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and (vi) a statement of the compensation to be paid for the study and testimony in the case.

*Id.* 26(a)(2)(B). If the expert is not retained, no written report is required, but the disclosure must nevertheless contain "(i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and (ii) a summary of the facts and opinions to which the witness is expected to testify." *Id.* 26(a)(2)(C). A Rule 26(a)(2)(C) disclosure is "considerably less extensive than the report required by Rule 26(a)(2)(B)." *Id.* advisory committee's note to 2010 amendment.

Although courts should not require "undue detail" for the disclosure of a non-retained expert witness, *id.*, "it is not acceptable to provide scant details." *Olutosin v. Gunsett*, No. 14-CV-0685 (NSR), 2019 WL 5616889, at *3 (S.D.N.Y. Oct. 31, 2019); *see also Barack v. Am. Honda Motor Co., Inc.*, 293 F.R.D. 106, 108 (D. Conn. 2013) (noting that a "mere list of names, accompanied by three-word descriptions of the subject matter of their testimony" is insufficient to satisfy Rule 26(a)(2)(C)). The disclosure must include both the subject matter and a summary of both the facts and the opinions on which the expert will testify. *See Olutosin*, 2019 WL 5616889, at *3; *see also Golding v. City of New York*, No. 15-CV-03498 (ALC) (SN), 2016 WL 6553759, at *2 (S.D.N.Y. Nov. 4, 2016) (finding the non-retained expert disclosure insufficient because there was no "summary of the facts and opinions").

Failure to comply with Rule 26 can subject a party to sanction in the form of preclusion under Rule 37(c)(1). Specifically, "a party who fails to make such disclosures [under Rule 26] is not allowed to use that information or witness to supply evidence . . . unless the failure was substantially justified or is harmless." *Chevron Corp. v. Donzinger*, No. 11-CV-0691 (LAK), 2013

WL 5493996, at *1 (S.D.N.Y. Oct. 3, 2013). Although Rule 37(c)(1) is "written in mandatory terms," the imposition of sanctions for abuse of discovery is "a matter within the discretion of the trial court." *Hein v. Cuprum, S.A., De C.V.*, 53 F. App'x 134, 136 (2d Cir. 2002). In deciding whether to exercise this discretion to impose sanctions, this Court must consider:

> (1) the party's explanation for the failure to comply with the disclosure requirement; (2) the importance of the testimony of the precluded witnesses; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance.

*Design Strategy, Inc. v. Davis*, 469 F.3d 284, 296 (2d Cir. 2006). Because preclusion is a drastic remedy, it should be exercised with caution. *See Olutosin*, 2019 WL 5616889, at *4; *compare NIC Holding Corp. v. Lukoil Pan Americas, LLC*, No. 05-CV-9372 (LAK) (FM), 2007 WL 1467424, at *5 (S.D.N.Y. May 16, 2007) (refusing to preclude certain fact witnesses from testifying, even though they were not identified initially, because any prejudice could be cured by permitting their depositions) *with In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13-CV-7789 (LGS), 2022 WL 4087842, at *6 (S.D.N.Y. Sept. 6, 2022) (precluding certain expert testimony because it failed to meet any of the four factors set forth in *Design Strategy*) *and Rodriguez v. Village of Port Chester*, 535 F. Supp. 3d 202, 211-16 (S.D.N.Y. Apr. 26, 2021) (precluding the plaintiff's expert, a treating physician, from testifying as a retained expert where, among other factors, the Rule 26 disclosures were inadequate and there was insufficient time to reopen discovery but permitting the witness to testify as a non-retained expert about his diagnosis and treatment of the plaintiff).

**DISCUSSION**

**I.      Plaintiff's Motion To Exclude**

        A.      <u>Stewart Verhulst</u>

           1.  Qualifications and Opinions

Defendant retained Verhulst to evaluate the causes and scope of any damage to the Insured Properties caused by the April 28, 2023 storm. (*See* ECF 84, Verhulst Decl. ¶ 3; ECF 80-11, Def.'s Expert Disclosures at 1.) Verhulst is a licensed professional engineer in multiple states and is the executive technical director at Nelson Forensics. (*See* ECF 84, Verhulst S.J. Decl. ¶ 1; ECF 84-1, Verhulst Resume at 3.) He has a graduate degree in engineering from the University of Texas at Austin and has published widely on, among other topics, roof collapses and failures, and their causes; and hail sizing and assessing hail damage. (*See* ECF 84-1, Verhulst Resume at 4.) He has evaluated the roofing on hundreds of buildings. (*See Id.*) Defendant indicated in its Rule 26 Disclosures that Verhulst would testify about "the cause and scope of damage" to the Insured Properties and might also rebut the opinions offered by Plaintiff's experts. (ECF 80-11, Def.'s Expert Disclosures at 1.)

On November 6 and 7, 2023 Verhulst and two assistants from Nelson Forensics conducted an examination of the Insured Properties and documented damage to the roofs, exteriors, and interiors of the Insured Properties, opined on the causes of those damages, and provided recommendations for remedial actions. (*See, e.g.,* ECF 84-2, Verhulst Reports at 5-15.) Verhulst opined that (1) the damage observed at the Insured Properties was limited and could be repaired without complete roof replacement; (2) the damage was unrelated to the April 28, 2023 storm; and (3) the isolated burnish marks at the Insured Properties, while attributable to

16

hail, would not "affect the performance or service life of the roof systems, and [we]re, therefore, cosmetic in nature." (ECF 84, Verhulst Decl. ¶¶ 5-7; *see generally* ECF 84-2, Verhulst Reports.)

### 2.    The Bases for Plaintiff's Challenge

Plaintiff does not contest Verhulst's qualifications as an expert or that testimony about causation would assist the trier of fact. (*See* ECF 79, Pl.'s *Daubert* Mem. at 10-11; ECF 96, Pl.'s *Daubert* Reply at 1-3.) Plaintiff instead challenges the reliability of Verhulst's opinions. (*See* ECF 79, Pl.'s *Daubert* Mem. at 10-11; ECF 96, Pl.'s *Daubert* Reply at 1-3.) Specifically, Plaintiff argues that Verhulst's opinion on causation – that the interior water damage was primarily caused by long-term leaks from and condensation at the plumbing or HVAC system pipes, rather than wind or rainwater intrusion at the roofs – is unreliable, and that his opinion that damage to the roof was cosmetic only was not properly disclosed and was unreliable. (*See* ECF 79, Pl.'s *Daubert* Mem. at 10; ECF 96, Pl.'s *Daubert* Reply at 1-2.)

### 3.    Analysis

I am satisfied that Verhulst is qualified to testify on the causes and scope of damage to the Insured Properties, given his academic credentials and publications and experience with field investigations (*see generally* ECF 84-1, Verhulst Resume). I am also satisfied that his testimony, if found to be reliable, would assist the trier of fact. *See Tardif v. City of New York*, 344 F. Supp. 3d 579, 603-04 (S.D.N.Y. 2018) (deciding a motion to exclude expert testimony

solely on the bases of reliability and helpfulness where the opposing party did not contest the

expert's qualifications). I address Plaintiff's challenges to Verhulst's opinions below.

a. *Causation of Interior Water Damage*

Plaintiff challenges as unreliable Verhulst's conclusion that the interior damage to the

Insured Properties was primarily related to long-term leaks or condensation at the plumbing or

HVAC system pipes, rather than wind or rainwater intrusion on the roofs. (*See* ECF 79, Pl.'s

*Daubert* Mem. at 10.) Plaintiff points out that Verhulst did not actually observe HVAC leaks or

condensation during his investigation (especially in the attics), could not see into the spaces

around the piping in the ceilings, provided no explanation for how the HVAC vents could have

been the source of the observed water damage, and failed to interview any tenants to

determine whether the leaks predated the storm. (*See Id.* at 10-11.) Plaintiff contends that

because Verhulst's opinions on the causes of interior damage are based on a flawed

methodology, those opinions should be excluded as unreliable.

A court may exclude expert testimony as unreliable only if the expert opinions reflect

unsupported subjective beliefs. *See Clarke v. Travco Ins. Co.*, No. 13-CV-5140 (NSR), 2015 WL

4739978, at *5-6 (S.D.N.Y. Aug. 7, 2015) (excluding a property inspector's assessment of

damage causation because it was simply based on his experience living near the damage site

rather than any meteorological data); *Northway Med. Ctr. Condo v. Hartford Fin. Servs. Grp.,*

*Inc.*, 745 F. Supp. 3d 170, 182 (S.D.N.Y. 2024) (excluding a property inspector's report because

his conclusion was not grounded in any technical or factual explanation), *aff'd sub nom*.

*Northway Med. Ctr. Condo v. Sentinel Ins. Co., Ltd.*, No. 24-2468-CV, 2025 WL 1703194 (2d Cir.

June 18, 2025). However, courts do not exclude expert conclusions that "are based on more

than subjective beliefs or unsupported speculation." *Park W. Radiology v. CareCore Nat. LLC*, 675 F. Supp. 2d 314, 327 (S.D.N.Y. 2009) (holding that disagreements about the kind of evidence an expert should rely on do not necessarily create a reliability issue in connection with a *Daubert* motion).

Here, although Verhulst indicated that, in some instances, tightly packed insulation prevented a clear view into the spaces above the ceiling tiles where plumbing and HVAC piping and ductwork were found, he nevertheless photographed and observed that most of the moisture-stained acoustical ceiling tiles ("ACTs") and light fixtures were located beneath or in the vicinity of plumbing and HVAC piping. (*See, e.g.,* ECF 84-2, Verhulst Reports at 45.) Verhulst also observed that, in some locations, none of the moisture-stained ACTs was located beneath the wind-attributed slices and punctures in the roof membranes. (*See id.* at 59.) Accordingly, Verhulst's conclusions "are based on more than subjective beliefs or unsupported speculation." *Park W. Radiology*, 675 F. Supp. 2d at 327. As such, his opinion regarding the causation of the interior water damage is sufficiently reliable to withstand *Daubert* scrutiny.

Plaintiff contends that Verhulst should have done more to investigate, such as by conducting moisture testing. (*See* ECF 96, Pl.'s *Daubert* Reply at 1.) But arguments that an expert's permissible methodology could have been improved by focusing on other factors and approaches go to the weight rather than the admissibility of the testimony. *See Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 355 (S.D.N.Y. 2023) ("[Defendant's] motion to preclude essentially asks the Court to determine which of the two experts is more reliable. But, having concluded that [Plaintiff's expert] . . . relied on permissible methods, determining the

weight to give the experts is a job for the jury."). Plaintiff may cross-examine Verhulst about

additional testing he did not perform. *See Park W. Radiology*, 675 F. Supp. 2d at 326.

Plaintiff also states that because Verhulst admitted that he did not access Location 10,

his opinions about the cause of any interior water damage at that location should be excluded.

(*See* ECF 79, Pl.'s *Daubert* Mem. at 11.) Defendant does not disagree; Verhulst made clear that

his analysis of interior water damage did not apply to Location 10. (*See* ECF 84-2, Verhulst

Reports at 15.) Because Rule 37(c)(1) of the Federal Rules of Civil Procedure provides a

presumption that a party cannot use information that it does not disclose or produce, and

because Defendant did not disclose that Verhulst would opine on interior water damages at

Location 10, Verhulst may not opine on the causes of the interior water damage at that

location.

### b. Cosmetic Damage

Plaintiff also asks the Court to preclude Verhulst from testifying in support of

Defendant's affirmative defense under the Policy's exclusion of coverage for cosmetic damage

to the roofs of the Insured Properties. (*See* ECF 79, Pl.'s *Daubert* Mem. at 14.) Plaintiff argues

that Defendant's Rule 26 Disclosures failed to indicate that either of its experts would testify as

to whether the claimed damage was merely cosmetic; Plaintiff concludes that Rule 37(c)

requires exclusion of any such testimony. (*See id.* at 15.) Defendant responds that it designated

Verhulst to testify about the causes and the scope of damage to the Insured Properties, as set

forth in his Reports, which reflected his opinions on superficial damage to the roofs. (*See* ECF

86, Def.'s *Daubert* Opp. at 10; ECF 80-11, Def.'s Expert Disclosures at 1.)

In his Reports, Verhulst documented and photographed "isolated burnish marks" on the roofs of certain Insured Properties that did "not exhibit distress related to hail impact that would affect the performance or service life of the roof systems." (*See* ECF 86, Def.'s *Daubert* Opp. at 10; ECF 84-2, Verhulst Reports at 9, 12, 14, 41.) As described by Verhulst, "[a] burnish mark (commonly referred to as a "splash" or "splatter" mark) results when an object, such as a hailstone, removes the exterior layer, algae, dirt, oxidation, or film on the surface of a material . . . commonly result[ing] in a freckled or mottled appearance on the impacted surface." (ECF 84-2, Verhulst Reports at 16.) Plaintiff counters that the burnish marks do not constitute "cosmetic damage" under the Policy (*see* ECF 96, Pl.'s *Daubert* Reply at 2-3),, which defines cosmetic damage as "marring, pitting or other superficial damage that altered the appearance of the roof surfacing" without preventing the roof "from continuing to function as a barrier" (ECF 6-1, Policy Statement at 80). I see no practical difference between Defendant's expert's discussion of the superficial damage to the roofs and Plaintiff's definition of "cosmetic damage" and, therefore, find that Defendant adequately disclosed its expert's opinion supporting the Policy's cosmetic damage exclusion under Rule 26.

Plaintiff contends for the first time in its reply brief in support of its motion to exclude that Verhulst's conclusion that the burnish marks were cosmetic is unreliable because Verhulst never tested the affected areas of the roofs for water intrusion, so that his conclusion was speculative. (*See* ECF 79, Pl.'s *Daubert* Mem. at 10; ECF 96, Pl.'s *Daubert* Reply at 1-2). In general, new arguments may not be made in reply papers, unless they address new material issues raised in the opposition papers. *See Duracell U.S. Ops., Inc. v. Energizer Brands, LLC*, No. 25-CV-5020 (JPC), 2025 WL 2388287, at *1 (S.D.N.Y. Aug. 18, 2025) (quoting *Ernst Haas Studio,*

21

*Inc. v. Palm Press, Inc.*, 164 F.3d 110, 112 (2d Cir. 1999) and *Bayway Refin. Co. v. Oxygenated Mktg. & Trading AG*, 215 F.3d 219, 226-27 (2d Cir. 2000)). The purpose of this rule is "to prevent a party from being prejudiced by the inability to respond to the opposing party's arguments or evidence." *Duracell,* 2025 WL 2388287, at *1 (citing *In re Harris*, 464 F.3d 263, 268 n.3 (2d Cir. 2006) (Sotomayor, J.)). If the nonmoving party has no opportunity to address new arguments or evidence presented in a moving party's reply, a district court may properly exercise its discretion to decline to consider the new arguments. *See Duracell,* 2025 WL 2388287, at *2.

Here, the reliability of Verhulst's opinion about cosmetic damage is not raised in Plaintiff's initial memorandum in support of its motion to exclude or in Defendant's opposition papers. (*See* ECF 79, Pl.'s *Daubert* Mem. at 10-11; ECF 86, Def.'s *Daubert* Opp. at 10.) I therefore would have discretion to decline to consider Defendant's arguments on that subject. I nevertheless consider Defendant's arguments about the reliability of Verhulst's opinion about cosmetic damage and conclude that they are unpersuasive.

Expert testimony may rest "upon scientific foundations, the reliability of which [may] be at issue," or "the relevant reliability concerns may focus upon personal knowledge or experience." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999). "In cases where experts draw a conclusion from a set of observations based on extensive and specialized experience, the method [they employ] is the application of experience to facts." *Scott*, 315 F.R.D. at 50. Such testimony is testable under *Daubert* in the sense that it is "provable (or disprovable) by equivalent industry." *Mahony v. JJ Weiser & Co., Inc.*, No. 04-CV-2592 (VM) (HBP), 2007 WL 3143710, at *6 (S.D.N.Y. Oct. 25, 2007). In such cases, courts often look to the

expert witness' experience to determine their reliability. *See, e.g.*, *Am. Empire Surplus Lines Ins.*, 743 F. Supp. 3d at 535, 541-42 (finding expert testimony reliable where an insurance expert applied "30 years" of experience to the facts); *Pension Comm. of Univ. of Montr. Pension Plan v. Banc of Am. Sec., LLC*, 691 F. Supp. 2d 448, 464-65 (S.D.N.Y. 2010) (finding expert testimony on custom and practice in the hedge fund industry reliable where the expert witness had performed due diligence on a many hedge funds); *Seneca Ins. Co. v. Wilcock*, No. 01-CV-7620 (MHD), 2007 WL 415141, at *9 (S.D.N.Y. Feb. 5, 2007) (finding that a "long-time insurance industry executive['s]" testimony on the meaning of the words "loss" and "claim" in the insurance industry was reliable).

Verhulst measured the diameter of the burnish marks and compared them to the size of the hail, as reflected in the meteorological data, and concluded – based on his extensive experience as an engineer – that because hail measuring half an inch in diameter or less has limited impact energy, it would not cause distress to the vast majority of building surfaces. (*See* ECF 84-2, Verhulst Reports at 41, 59, 76.) In light of Verhulst's experience and the "well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions," *Nimely,* 414 F.3d at 395, Verhulst's opinion that the burnish marks constitute cosmetic damage is reliable. Whether Verhulst's adequate methodology could have been improved is a question for cross-examination; Plaintiff may question Verhulst on his failure to test areas with superficial damage for water intrusion.

****

For the reasons set forth above, Verhulst's opinion on the scope and causes of the interior water damage at Locations 1 to 9 is reliable; Defendant sufficiently disclosed Verhulst's

23

opinion on cosmetic damage; and Verhulst's opinion on cosmetic damage is reliable.

Accordingly, Plaintiff's motion to exclude Verhulst's opinions is DENIED IN PART, in that

Verhulst's expert opinions on those subjects are not excluded; and Plaintiff's motion to exclude

Verhulst's expert opinions is GRANTED IN PART, in that to the extent he has expressed an

opinion on the causes of interior water damage at Location 10, such opinion is excluded.

### B.    Rodgers Truitt

#### 1.   Qualifications and Opinions

Truitt, a non-retained expert, is a national general insurance adjuster at Engle Martin &

Associates with over a decade of experience adjusting property insurance claims. (*See* ECF 83,

Truitt Decl. at 1-2.) Truitt holds a certification granted by Haag Engineering signifying that he

completed "specialized training in roof damage assessment, particularly for storm, hail, and

wind damage"; he has examined hundreds of commercial properties and calculated insurance

payments considering deductibles and coinsurance participation requirements. (*Id*.) Defendant

retained him on August 4, 2023 to assist with evaluating Plaintiff's claim following the April 28,

2023 storm. (*See id*. ¶ 2; *see also* ECF 80-4, Truitt Report at 1.) Truitt's assignment included

"evaluati[ng] . . . the cause and scope of damage to the [Insured] Properties, if any, caused by a

storm on April 28, 2023, the cost to repair that damage and the amount of payment, if any,

under the Mt. Hawley policy covering the [Insured] Properties considering the cost of repair,

deductible, depreciation, and coinsurance." (*See* ECF 83, Truitt Decl. at 1.) In its Rule 26

Disclosures, Defendant indicated that Truitt would opine on those topics and also rebut the

opinions and estimates offered by Plaintiff's experts. (*See* ECF 80-11, Def.'s Expert Disclosures at

1-2.)

24

Truitt inspected the Insured Properties on August 16, 17, and 18, 2023, reviewed the Verhulst Reports, and prepared an estimate of damage utilizing the Xactimate computer program, which is a widely used program to assist with adjustment of property insurance claims. (*See* ECF 83, Truitt Decl. ¶¶ 3-4.) Truitt calculated the replacement cost value of each location and determined that "the deductible, coinsurance penalty and depreciation result[ed] in no payment under the [Insurance Policy] for the claimed loss." (*Id.* at ¶¶ 5-12.)

As a non-retained expert, Truitt was not required to provide an expert report, *see* Fed. R. Civ. Proc. 26(a)(2)(B); however, in his role as an insurance adjuster evaluating Plaintiff's claim, he prepared a 43-page report dated August 22, 2023 setting out his observations of the Insured Properties, his estimate of the amount and cause of any loss, and coverage considerations, including coinsurance calculations. (*See generally* ECF 80-4 Truitt Report; *see also* 83, Truitt Decl. ¶¶ 4, 5, 12.)

The Truitt Report states, "CAUSE OF LOSS: CAT 40 – Wind/Hail" and goes on to make the following observations about causation:

- "During our inspection of the five roofing systems of [Locations 1-5], we could find no evidence of any wind or hail damage to the single-ply roofing systems of the buildings . . . [and] no storm-created opening to the [Locations 1-10] roofing systems which would have contributed to the observed interior water damage . . . ."

- "During our inspection of the three roofing systems of [Locations 6-8], we could find no evidence of any wind or hail damage to the single-ply roofing systems of the buildings . . . [but] we did note minor hail damage to multiple metal power attic vent covers [for Locations 6-8] . . . . As stated above, we could find no storm-created opening to the five roofing systems which would have contributed to the observed interior water damage . . . ."[7]

---

[7]    The reference to five roofing systems at Locations 6 to 8 (*see* ECF 80-4, Truitt Report at 6) appears to be a typographical error for three roofing systems.

25

- "During our inspection of the two roofing systems of [Locations 9-10], we could find no evidence of any wind or hail damage to the single-ply roofing systems of the buildings . . . [but] we did note minor wind damage to the parapet wall cap flashing of the building at Location 9 . . . . As stated above, we could find no storm-created opening to the five roofing systems which would have contributed to the observed interior water damage."[8]

(ECF 80-4, Truitt Report at 5-6.) The Truitt Report also indicates that, "[a]s the claimed damages are a result of reported wind and hail, there is no potential avenue for subrogation recovery."

(*Id.*)

In his initial report and subsequent valuation, Truitt provided a statement of loss, the Xactimate estimates for cost of repairs, the coinsurance requirement calculations, and the CoreLogic Valuation reports reflecting the value of the Insured Properties as of July 2024 on which he relied. (*See* ECF 80-4, Truitt Report; ECF 83, Truitt Decl. ¶¶ 6, 12; ECF 83-2, Xactimate Estimates for Cost of Repair; ECF 83-3, Coinsurance Requirement Calculations; ECF 83-4, CoreLogic Property Valuation Reports; ECF 83-5, Statement of Loss.)[9] Truitt's initial expert report estimated the total storm-related damage to the Insured Properties, based on his own inspection, to be $2,730.22; he later revised his estimate to $33,510.35 based entirely on Verhulst's description of the damage and Verhulst's recommended repairs and replacements. (*See id.* at 7; ECF 83, Truitt Decl. ¶ 4.)

Truitt also determined that the Policy had an 80% coinsurance requirement applicable to the claimed loss. (*See* ECF 80-4, Truitt Report at 4; ECF 83, Truitt Decl. ¶ 6.) Truitt calculated the

---

[8]     The reference to five roofing systems at Locations 9 to 10 (*see* ECF 80-4, Truitt Report at 6) appears to be a typographical error for two roofing systems.

[9]     CoreLogic is a "nationally recognized property information, analytics, and data-enabled solutions provider that is widely used" in connection with the evaluation of property insurance claims. (*See* ECF 83, Truitt Decl. ¶ 5.)

replacement costs for each of the Insured Properties and determined that none of the Insured

Properties was insured to value, so that the Policy's coinsurance provision applied to each of the

Insured Properties. (*See* ECF 80-4, Truitt Report at 4; ECF 83, Truitt Decl. ¶¶ 6-12; ECF 83-5,

Statement of Loss.) Truitt concluded that the replacement costs for each location, after

depreciation and application of the coinsurance provision, were less than the Policy deductible,

resulting in no payment for the claimed loss. (*See* ECF 83, Truitt Decl. ¶12.)

2.   The Bases for Plaintiff's Challenge

Plaintiff does not contest Truitt's expertise or qualifications as an insurance adjuster, or

that his testimony about the inspection, the scope and cause of damage, and his assessment of

the insurance claim would assist the trier of fact. (*See* ECF 79, Pl.'s *Daubert* Mem. at 11-14.)

However, Plaintiff does challenge: Truitt's qualification to assess the replacement value of the

Insured Properties and to opine on the impact of the coinsurance provision on recoverable loss

under the Policy; the sufficiency of Defendant's disclosure that Truitt would be opining on

causation of the interior water damage and on exterior cosmetic; and the reliability of Truitt's

opinions on the causes and scope of the interior water damage, which Plaintiff contends were

entirely derivative of Verhulst's opinions, and of Truitt's calculations of coinsurance amounts,

which Plaintiff contends were based on incorrect data. (*See* ECF 79, Pl.'s *Daubert* Mem. at 11-14;

ECF 96, Pl.'s *Daubert* Reply at 3-4.)

3.   Analysis

Truitt's testimony, if found reliable, would assist the trier of fact, because Plaintiff's

claim requires it to prove that the damage was caused by the storm as well as the amount of

the covered loss. *See Tardif*, 344 F. Supp. 3d at 603-04 (finding an expert's proffered testimony

on causation to be helpful to the trier of fact because causation was at issue in the case). I address Plaintiff's challenges to Truitt's opinions below.

### a. Qualifications

Plaintiff's claim that Truitt is not qualified to determine the replacement cost of the buildings because such an assessment requires specific expertise in the costs of building new properties (*see* ECF 79, Pl.'s *Daubert* Mem. at 14) – is unsupported by any authority. General insurance adjusters such as Truitt investigate and assess insurance claims, which may include estimating replacement costs. (*See id.*) Accordingly, I am satisfied that Truitt is qualified to opine on the effect of the Policy's coinsurance provisions as well as on the cause and scope of damage to the Insured Properties, based on his decade-plus of experience in adjusting property insurance claims, which necessarily includes determining the cost of repairs, replacement costs, and calculating deductibles and coinsurance requirements. (*See* ECF 83, Truitt Decl. ¶ 1; ECF 83-1, Truitt Resume at 1.)

### b. Causation

Plaintiff argues that Truitt should be precluded from testifying on the causes of the interior water damage because Defendant failed to disclose that he would be testifying as to causation and because he expressed no opinion on causation in his report. (*See* ECF 79, Pl.'s *Daubert* Mem. at 11.) It is true that Defendant did not mention the term causation when describing the anticipated scope of Truitt's opinions: Defendant stated in its Rule 26 Disclosures that Truitt "is expected to testify regarding his inspection of Plaintiff's property, the scope of damage thereto, the cost of repairing such damage, appropriate depreciation, and coinsurance applicable to Plaintiff's claim" (ECF 80-11 Def.'s Expert Disclosures at 1); Plaintiff points out that

28

by contrast, Defendant expressly indicated that Verhulst would testify about causation. (See *id.* ("Mr. Verhulst is expected to testify regarding his investigation of Plaintiff's property and his opinions as to the cause and scope of damage thereto, as set forth in his reports [attached to the disclosure]."). However, the Truitt Report, portions of which Defendant provided to Plaintiff on August 25, 2023 (*see* ECF 80-3, First Denial Letter), documented Truitt's inspection and stated that Truitt found "no evidence of any wind or hail damage to the multiple roofing systems of the e buildings which would have allowed the observed water intrusion into the interiors of the various office spaces." (*id.*; *see also* ECF 80-4, Truitt Report at 2.) Thus, Plaintiff is incorrect that the Truitt Report expresses no opinion on the causes of the interior water damage at the Insured Properties.

Defendant's disclosure, while imperfect, gave Plaintiff notice as to the content of Truitt's opinions, which is the purpose of the expert disclosure rules. *See Harkabi v. SanDisk Corp.*, No. 08-CV-8203 (WHP), 2012 WL 2574717, at *3 (S.D.N.Y. June 20, 2012) (noting that the purpose of the expert disclosure rules is to provide notice and avoid unfair surprise to the opposing party). Plaintiff had the opportunity to depose Truitt but declined to do so. (*See* ECF 86, Def.'s Opp. at 3.) Truitt acknowledged in his declaration that he was hired by Defendant to evaluate the cause and scope of damage to the Insured Properties. (*See* ECF 83, Truitt Decl. ¶ 2.) Under these circumstances, Plaintiff suffers no prejudice from a lack of an express statement in Defendant's Rule 26 Disclosure that Truitt would opine on causation. *See Champagne v. Columbia Dental PC*, No. 22-911-CV, 2023 WL 6053001, at *2 (2d Cir. Sept. 18, 2023) (holding that the appellant could not show harm from the appellee's failure to disclose certain medical records under Rule 26 because the appellant received those records over two years before trial,

had an opportunity to depose the custodian of the records, and conducted an independent medical examination of the appellee); *Olutosin*, 2019 WL 5616889, at \*13 (finding that the plaintiff's late disclosure of an expert's identity harmless because documents indicated that the defendant had "sufficient notice" of the identity of that expert and was aware of the subject matter and content of his potential testimony); *Rovi Guides, Inc. v. Comcast Corp.*, 410 F. Supp. 3d 628, 639 (S.D.N.Y. 2019) ("To be sure, deposition testimony on a topic does not cure a failure to provide Rule 26 disclosure. But where, as here, an expert's deposition unambiguously presents an infringement theory that is included, if only generally, in the initial expert report, this Court will not order the drastic remedy of striking all later elaborations of the theory on the basis of that initial haziness.").

Sanctioning a party under Rule 37 for failure adequately to disclose the subject of an expert's testimony by precluding the expert from testifying on the subject is a drastic remedy to be avoided absent "flagrant bad faith" or "callous disregard of the rules." *Olutosin*, 2019 WL 5616889, at \*4-5 (declining to exclude two of Defendant's expert witnesses for insufficient disclosure in the absence of bad faith and instead limiting the witnesses' testimony). Plaintiff does not argue that Defendant acted in bad faith, and I have seen no evidence that Defendant willfully intended to impede discovery. *Cf. Daval Steel Prods. v. M/V Fakredine,* 951 F.2d 1357, 1366 (2d Cir. 1991) (upholding preclusion of evidence sanction because conduct of the defendant's counsel "evince[d] a willful frustration" of discovery). The insufficiency, if any, in Defendant's disclosure of the scope of Truitt's expert opinion is harmless. *See Olutosin*, 2019 WL 5616889, at \*13. Accordingly, I decline to exclude Truitt's opinions on causation.

c. *Scope of Damage*

Plaintiff argues that Truitt's opinion on the scope of damage should be excluded as unreliable because the opinion lacks any independent analysis. (*See* ECF 79, Pl.'s *Daubert* Mem. at 11-12.) Defendant counters that this argument goes to weight rather than admissibility and that Plaintiff will have the opportunity to cross examine Truitt about his revisions following his review of Verhulst's Reports. (*See* ECF 86, Def.'s Preclude Opp. at 8 (citing *Better Holdco, Inc. v. Beelines Loans, Inc.*, 666 F. Supp. 3d 328, 375 (S.D.N.Y. 2023).) Moreover, according to Truitt, insurance claims adjusters regularly rely on engineering reports, such as the Verhulst's report (*see* ECF 83, Truitt Decl. at ¶ 3); Defendant therefore contends that it is appropriate for Truitt to base his conclusions about the scope of damage on Verhulst's Reports. (*See* ECF 86, Def.'s Preclude Opp. at 8.)

While an expert is permitted to rely on "facts, opinions, and data not of the expert's own making – including analyses performed or findings made by another expert in the case –" he may not "merely recite another expert's opinion" as his own. *U.S. Bank Nat. Ass'n v. PHL Variable Life Ins. Co.*, 112 F. Supp. 3d 122, 131 (S.D.N.Y. 2015). Thus, in *U.S. Bank*, this Court considered the reliability of an expert's opinion that combined the expert's own analysis with that of another expert. *See* 112 F. Supp. 3d at 131. The Court declined to exclude the expert's opinion, even though he had not verified his colleague's methodology and data; the Court concluded that the expert had relied on another's analysis to form his own separate conclusions and therefore that the opinion should not be excluded. *See id.* By contrast, the court in *Member Services Inc. v. Security Mutual Life Insurance Co. of New York* excluded a portion of an expert report because it simply repeated another expert's conclusions and did not

include any independent analysis. *See Member Servs.,* No. 06-CV-1164 (TJM), 2010 WL 3907489, at *27 (N.D.N.Y. Sept. 30, 2010).

Truitt's opinion on the scope of damage is comparable to the excluded portion of the expert opinion in *Member Services*. Truitt simply adopted Verhulst's conclusions on the scope of damage, without performing any independent analysis. While it may be true that insurance claim adjusters, like Truitt, regularly rely on engineering reports in performing their jobs, that practice provides no "reasonable basis to allow a second expert to testify about the same things," *Member Servs.*, 2010 WL 3907489, at *27. Accordingly, Truitt's opinion on the scope of damage – both interior and exterior – is excluded.[10]

### d. Coinsurance

Under the Policy, Defendant does not pay the full amount of any loss if the product of the value of the Insured Properties "at the time of loss" and the coinsurance percentage is

---

[10]    Scope of damage and causation are related but not identical concepts. And Plaintiff challenges the reliability of Truitt's opinion as to the scope of damage but not as to causation. I therefore do not exclude or limit Truitt's testimony on causation.

Plaintiff also argues that Truitt's opinion that the claimed damage to the roofs was merely cosmetic should be excluded because Defendant's Rule 26 Disclosures failed to indicate that either of its experts would testify on that subject. (*See* ECF 79, Pl.'s *Daubert* Mem. at 16.) Defendant responds to this argument as to Verhulst, but Defendant does not counter this argument as to Truitt. (*See* ECF 86, Def.'s Opp. at 10.) Unlike the Verhulst Reports, the Truitt Report makes no mention of "cosmetic damage," damage to the surface of the roofs, or "burnish marks." (*See* ECF 80-4, Truitt Report at 5-6.) Rather, the Truitt Report notes "wind damage" and "hail damage" but does not describe what the damage further. (*See id.*) The Truitt Report does reference portions of the Insurance Policy containing exclusions of coverage due to loss or damage due to "wear and tear," "deterioration," "continuous or repeated seepage or leakage of water," and similar causes – but not the section covering exclusions for cosmetic damage. (*See id.* at 2-3.) These references would not have been sufficient to put Plaintiff on notice that Truitt would opine on cosmetic damage to the roofs. Accordingly, the failure to disclose that Truitt planned to opine on cosmetic damage to the roofs is an independent basis to exclude such testimony.

greater than the Policy limit. Truitt relied on CoreLogic property valuation reports dated August 21, 2023 that reflected estimated reconstruction costs as of July 2023, as opposed to reports reflecting estimated reconstruction costs from April 28, 2023 – the date of the storm – to prepare his coinsurance estimates. (*See* ECF 83, Truitt Decl. ¶ 5; *see generally* ECF 83-4, CoreLogic Property Valuation Reports.) Those reports indicated that as of July 2023, Locations 1-5 had a replacement value of $1,637,858.00, Location 6 had a replacement value of $673,293.00, Location 7 had a replacement value of $1,257,986.00, Location 8 had a replacement value of $374,000.00, Location 9 had a replacement value of $667,549.00, and Location 10 had a replacement value of $430,399.00. (*See* ECF 83, Truitt Decl. ¶ 6-11; *see generally* ECF 83-4, CoreLogic Property Valuation Reports.) Plaintiff argues that Truitt is not qualified to perform the calculations and that even if he were qualified, his coinsurance calculations are unreliable in that they were based on the wrong data. (*See* ECF 79, Pl.'s *Daubert* Mem. at 12-14.)

Defendant points out that Truitt frequently performs calculations using CoreLogic property valuation reports in the course of his work and that Truitt explained that such reports are widely used and accepted as reliable for adjusting property insurance claims. (*See* ECF 83, Truitt Decl. at 4.) Truitt's extensive experience in adjusting property insurance claims, including calculating insurance payments under policies involving coinsurance participation requirements using CoreLogic valuation reports (*see* ECF 83, Truitt Decl. at 1-2, 4), qualify him to opine on the coinsurance provisions in this case. *See In re M/V MSC FLAMINIA*, 2017 WL 3208598, at *4 (noting that as long as a witness has expertise is in a field closely related to the subject matter of the proposed testimony, Rule 702's qualification standards are satisfied).

Plaintiff's argument that Truitt's coinsurance calculations are unreliable because they are based on the wrong data is also unpersuasive. To be sure, a "district court should consider the indicia of reliability identified in Rule 702," including that "the testimony is grounded on sufficient facts or data." *Amorgianos*, 303 F.3d at 265. Here, Truitt provides an explanation for his use of the CoreLogic reports dated August 2023: the reports reflected property values as of two months immediately after the claimed loss (July 2023) and therefore, he asserts, demonstrate an accurate estimate of the value of the Insured Properties at the time of the loss. (*See* ECF 83, Truitt Decl. ¶ 5.) I am mindful that doubts about reliability "should generally be resolved in favor of admissibility," *In re Zyprexa*, 489 F. Supp. 2d at 285, and Truitt's justification of using the August 2023 reports convinces me that Truitt's opinion is grounded on "sufficient data." Accordingly, I decline to exclude Truitt's coinsurance calculations. Plaintiff may attack Truitt's use of the August 2023 reports as the basis for his coinsurance calculations through cross-examination, which is a "traditional and appropriate means of attacking shaky but admissible evidence." *Crown Cork & Seal Co., Inc. Master Ret. Tr. v. Credit Suisse First Bos. Corp.*, No. 12-CV-05803 (JLG), 2013 WL 978980, at *3 (S.D.N.Y. Mar. 12, 2013) (citing *Daubert*, 509 U.S. at 596).

****

For the reasons set forth above, Truitt's opinion on coinsurance calculation is reliable; Defendant sufficiently disclosed Truitt's opinion on causation; and Truitt's opinion on causation is reliable. Accordingly, Plaintiff's motion to exclude Truitt's opinions is DENIED in part, in that Truitt's expert opinions on those subjects are not excluded; and Plaintiff's motion to exclude

34

Truitt's expert opinions is GRANTED IN PART, in that to the extent he has expressed an opinion on the scope of damage to the Insured Properties, such opinion is excluded.

**II.    Defendant's Motion To Exclude**

    A.    <u>Cord Largo</u>

        1.  Qualifications and Opinions

Cord Largo, a non-retained expert on the scope of damage to the roofs of the Insured Properties, the need for replacement of the roofs, and the estimated cost of the repairs, is a Texas and Colorado licensed public adjuster with over a decade of experience. (*See* ECF 89-1, Pl.'s Expert Disclosures at 6-7; ECF 89-2, Largo Tr. at 21:13-22; 24:13-25:7.) Largo has taken training courses relating to construction, estimating, and public adjusting. (*See* ECF 89-2, Largo Tr. at 23:13-22.) Largo's employer, Under Paid Claim, rented an office at one of the Insured Properties and had previously conducted unrelated insurance inspections for Plaintiff. (*See id.* at 33:13-34:17.) Plaintiff designated Largo to "offer opinions regarding the observations and conclusions he made during his inspection(s), including his determination that the roofs were damaged, and that the damage warranted replacement of the roof systems." (ECF 89-1, Pl.'s Expert Disclosure at 6-7.) Plaintiff indicated in its Rule 26 Disclosures that it expected Largo to opine on "his determination that the roofs were damaged, and that the damage warranted replacement of the roof systems," as well as on the replacement costs. (ECF 89-1, Pl.'s Expert Disclosures at 5-6.)

After the April 2023 storm, in July 2023, Largo noticed new water damage in his office complex and notified Sandoval. (*See* ECF 89-2, Largo Tr. at 37:4-22.) Plaintiff contracted with Largo to inspect the Insured Properties, and as part of the inspection Largo provided a report

documenting the scope of the damage. (*See id.* at 37:23-38:17, 42:3-6, 43:14-44:9.) When inspecting the Insured Properties, Largo walked through the property, assessed the interior and exterior of the properties, took measurements using a laser pointer, looked at the roofs, and took notes documenting his observations. (*See id.* at 44:2-9.) Largo also captured his observations with photos using the camera on his phone and a drone to photograph the roofs. (*See id.* at 48:15-19; *see generally* ECF 80-5, Largo Report Part 1; ECF 80-6, Largo Report Part 2.)

To quantify the cost of repairs, Largo used the Xactimate program, a standard tool for determining valuations when prompted with the location, scope, and measures of the identified damages. (*See* ECF 89-2, Largo Tr. at 52:9-17.) Largo hired an independent contractor Ezekiel Juarez, to prepare the Xactimate estimates, which required Juarez to input Largo's field observations into the program at Largo's direction. (*See, e.g. id.* at 53:10-55:18, 75:12-23, 96:10-97:1.) Largo reviewed all the resulting estimates of the cost of repairs. (*See id.* at 75:16-23.) After inspecting the Insured Properties, Largo determined that all of the roofs were damaged and needed replacement and that the cause of the damage was "hail and wind"; Largo estimated the cost of repairing each property as follows: Locations 1-5 – $1,321,802.60; Location 6 – $118, 612.06; Location 7 – $241,135.59; Location 8 – $82,573.24; Location 9 – $96,910.44; Location 10 – $42,082.25. (*See* ECF 89-2 Largo Tr. at 76:13-77:2, 78:3-13, 148:4-12; ECF 80-5, Largo Report Part 1 at 7-17, 177-84, 217-28, 284-94; ECF 66 Pl.'s CSUMF ¶¶ 17-18.)

2.  The Bases for Defendant's Challenge

Defendant does not contest Largo's expertise or qualifications as an expert or that his proffered testimony would assist the trier of fact. (*See* ECF 76, Def.'s *Daubert* Mem. at 8-10; ECF 93, Def.'s *Daubert* Reply at 1-5.) However, Defendant challenges the reliability of Largo's

testimony and opinions, asserting that Largo's opinion on the scope of the damage should be excluded as unreliable because Largo is simply a conduit for the opinion of Juarez, an unproduced expert, and that Largo's opinion on causation should be excluded because Plaintiff failed to disclose that Largo would opine on causation and because Largo's opinions on causation are subjective and therefore unreliable. (*See* ECF 76, Def.'s *Daubert* Mem. at 3, 9-10.)

2. Analysis

I am satisfied that Largo is qualified to testify on the cause and scope of damage to and costs of repairing the Insured Properties, given his 10-plus years of experience in adjusting property insurance claims and relevant training. (*See* ECF 89-2, Largo Tr. at 21:13-22:18; 24:13-25:6.) And his testimony, if found to be reliable, would assist the trier of fact. *See Tardif*, 344 F. Supp. 3d at 603-04. I address Defendant's challenges to Largo's opinions below.

a. *Scope of Damage*

Defendant argues that Largo's opinion on the scope of damages is unreliable because Largo (1) did not personally quantify the damages, (2) has no documentation of his instructions to Juarez, who actually prepared the estimates, and (3) followed his usual practice of discarding his field notes, on which Juarez relied to prepare the estimates, after the estimates were completed. (*See* ECF 76, Def.'s *Daubert* Mem. at 8; ECF 89-2, Largo Tr. at 44:19-44:16.) Defendant concludes that Largo's opinion on damages is unreliable because it merely reproduces the work of another expert. (*See* ECF 76, Def.'s *Daubert* Mem. at 8 (citing *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 664 (S.D.N.Y. 2007) for the proposition that an expert's testimony is unreliable when it reproduces another expert's analysis without contributing any input or supervision).)

Largo extensively documented his observations with photos. (*See* ECF 80-5, Largo Report Part 1; ECF 80-6, Largo Report Part 2). Although he destroyed his field notes, he confirmed under oath at his deposition that he had in fact taken notes and measurements during his inspection of the Insured Properties, including on the scope of the damage and what needed to be replaced. (*See*, *e.g.,* ECF 89-2, Largo Tr. at 44:3-9, 44:19-23, 54:25-55:4, 56:15-57:11, 96:9-17.)

To quantify the cost of repairs, Largo had Juarez use Xactimate, a standard tool for determining valuations when prompted with the proper location, scope, and measures of the identified damages. While Juarez entered Largo's field observations into the program, Largo testified that he directed Juarez's work and reviewed all estimates. (*See*, *e.g., id.* at 54:15-17, 75:16-23.) Taken together, these factors render Largo's opinion more than mere adoption of Juarez's work. The absence of field notes or directions to Juarez and Largo's reliance on Juarez's work go to the merit and credibility of Largo's testimony, rather than admissibility. *See Ram Krishana Inc. v. Mt. Hawley Ins. Co.*, No. 22-CV-3803 (JLR), 2025 WL 371016, at *14 (S.D.N.Y. Feb. 3, 2025) (accepting an expert's Xactimate estimates even though there were no documentation demonstrating the objectivity of the inputs).

### b. Causation

Defendant also contends that Largo should be precluded from opining that the damage reflected in the Xactimate estimate was caused by the April 2023 storm, because he was not designated to testify about causation and his report contains no opinion on causation. (*See* ECF 76, Def.'s *Daubert* Mem. at 9-10.) Defendant is correct that Plaintiff's Rule 26(a) disclosure merely states that Largo was expected to testify about his inspection of the Insured Properties,

including his determination that the roofs were damaged and needed to be replaced. (*See* ECF 89-1, Pl.'s Expert Disclosure at 6-7.) While Largo's report does not explicitly state the causes of the damage, at his deposition, Largo pointed out that the first page of each Xactimate report includes a notation that the cause of the damage was "hail and wind." (ECF 89-2, Largo Tr. at 76:13-77:2.)

The harsh sanction of excluding expert testimony because of inadequate disclosure of the subject of the expert's expected testimony is generally reserved for situations where the insufficient disclosure was due to "flagrant bad faith" or "callous disregard of the rules," *Olutosin*, 2019 WL 5616889, at *4. Defendant does not argue that Plaintiff's inadequate disclosure was a result of bad faith or disregard for the rules, and I have seen no evidence of bad faith. Largo's opinion on causation was reflected in the Xactimate reports. (*See, e.g.*, ECF 71-13, Largo Tr. at 76:13-79:13.) Defendant was sufficiently on notice of Largo's opinion on causation notwithstanding the absence of Plaintiff's failure to provide proper disclosure under Rule 26.

Defendant goes on to argue that Largo's causation opinion – that any water intrusion on the ceilings of the Insured Properties was caused by roof leaks rather than leaks or condensation from pipes or HVAC units – is conclusory, not based in any scientific methodology, and therefore unreliable. (*See* ECF 76, Def.'s *Daubert* Mem. at 9-10; ECF 93, Def.'s Preclude Reply at 2-4.) The only basis for Largo's opinion is his experience that "[n]ine out of ten times it's a roof leak" and "[o]ne time it's something else." (ECF 89-2, Largo Tr. at 80:4-5.) The conclusion that the leaks at the Insured Properties were caused by damage to the roofs from the storm because in Largo's experience 90 percent of water intrusions from ceilings are

caused by roof leaks is untethered to any observations about or investigation into the leaks at the Insured Properties.[11] While an expert may reach conclusions based on experience, the expert must apply his experience to the facts of the case. *See Kumho Tire*, 526 U.S. at 156 (noting that "an expert might draw a conclusion from a set of observations based on extensive and specialized experience").

Largo made no effort to assess whether the damage at the Insured Properties was the minority case where the water intrusion was not caused by roof damage. Largo testified that water intrusion caused by roof leaks is often widespread, whereas water intrusion caused by leaks from a plumbing or HVAC system is typically isolated (See ECF 89-2, Largo Tr. at 80:12-16), yet Largo did not remove any ceiling tiles to assess whether the intrusion was widespread or isolated. (*See id.* at 79:20-25, 80:17-21). Largo's failure to tailor his opinion on causation to the condition of the Insured Properties means his opinion is subjective ipse dixit and therefore unreliable. Accordingly, Largo is precluded from opining on causation.

****

For the reasons set forth above, Largo's opinions on the scope of damages to the Insured Properties are sufficiently reliable to withstand Daubert scrutiny. Accordingly, Defendant's motion to exclude Largo's opinions is DENIED in part, in that Largo's expert opinion the scope of damages is not excluded; and Defendant's motion to exclude Largo's expert opinions is GRANTED IN PART, in that his opinions on causation regarding interior water

---

[11]    To the extent that Largo is advancing a statistical argument, he has provided no information about his methodology, such as the sample size or the basis for selecting his sample; accordingly, any opinion by Largo based on statistical analysis is unreliable. *See, e.g., U.S. Info. Systems, Inc. v. Int'l Brother. of Elec. Workers Loc. Union,* 313 F. Supp. 2d 213, 235 (S.D.N.Y. 2004).

damage are excluded; and to the extent he has expressed an opinion on causation regarding exterior damage, such opinion is limited that which is supported by photographic evidence taken during his inspection.

        B.     <u>David Poyner</u>

        1.   Qualifications and Opinions

Plaintiff retained Poynor as an expert on the cost of repairing or replacing storm-damaged portions of Insured Properties. (*See* CF 89-1, Pl.'s Expert Disclosures at 3; ECF 89-4, Poynor Report at 2.) Poynor is a builder, former licensed insurance adjuster, insurance appraiser, and umpire in Texas and is the President of the Poynor Group, "a general contracting, consulting, and estimating company" based in Texas. (*See* ECF 89-4, Poynor Report at 2; ECF 89-5, Poynor Curriculum Vitae at 1-2 ("Poynor Resume").) Poynor has 15 years of experience as an insurance umpire, four years of experience as a licensed adjuster in Texas, and many years of experience as a builder and general contractor. (*See* ECF 89-4, Poynor Report at 2; ECF 89-5, Poynor Resume at 1.) Poynor holds multiple relevant certifications and licenses and has completed several relevant training courses. (*See* ECF 89-5, Poynor Resume at 2.) Poynor has been qualified as an expert witness in property damage insurance claim disputes in state and federal courts. (*See* ECF 89-4, Poynor Report at 2.) Plaintiff designated Poynor as an expert on the subject of damages and stated that he would opine "regarding the reasonable and necessary cost of repairing or replacing storm damaged items to the property." (ECF 89-1, Pl.'s Expert Disclosures at 3.)

On September 24 and 25, 2024, Poynor conducted an inspection of the Insured Properties and documented the damage he observed; he provided Plaintiff with an estimated

41

cost of repair. (*See* ECF 89-4, Poynor Report at 2.) Poyner observed direct damages, ruled out other possible causes of observed damages other than the storm event, and determined pre-loss condition through interviews and walkthroughs with the representatives of the Insured Properties. (*See id.* at 2-3.) He concluded that "a replacement cost value of $1,487,152.81 and an actual cost value of $1,356,027.74 is a true and fair estimate of the scope of repairs and reasonable cost to repair damages that were a direct result of the storm event." (*Id.* at 1-4.)

### 2. The Bases for Defendant's Challenge

Defendant does not contest Poynor's qualifications or that his testimony would assist the trier of fact. (*See* ECF 76, Def.'s *Daubert* Mem. at 10-13; ECF 93, Def.'s *Daubert* Reply at 5-11.) However, Defendant contests the reliability of Poynor's opinions on causation, arguing that he should be precluded from opining the cause of damage to the Insured Properties because Plaintiff did not designate as a causation expert and his report contained no opinions on causation; Defendant goes on to argue that Poyner's opinions are unreliable, because Poyner "parrot[s]" the conclusions of Plaintiff's representatives and failed to conduct tests to back up his opinions. (*See* ECF 76, Def.'s *Daubert* Mem. at 11.)

### 3. Analysis

I am satisfied that Poynor is qualified to testify on the cause and scope of damage to the Insured Properties, in light of his training, certifications, and years of experience (*see generally* ECF 89-4, Poynor Report; ECF 89-5, Poynor Resume). His testimony, if found to be reliable, would assist the trier of fact. *See Tardif*, 344 F. Supp. 3d at 603-04. I address Defendant's challenges to Poyner's opinions on causation below.

As to the adequacy of Plaintiff's disclosure of the scope of Poyner's testimony, Plaintiff's Rule 26 Disclosure does not explicitly mention that Poynor will testify about causation. (ECF 89-1, Pl.'s Expert Disclosure at 3.) However, Poyner's Report attributes the damage to wind and hail and describes his general approach to determining causation. (ECF 89-4, Poyner Report at 1-4.) At his deposition, Poyner testified that the roofs of the Insured Properties were damaged by the April 2023 storm, which led to interior leaks. (*See*, *e.g.*, ECF 89-3, Poynor Tr. at 74:14-75:3.) He supported his opinion, for example, by noting that although hail did not create any openings in one of the roofs at Location 8, he observed and photographed panels that had been blown off the roof, which created a potential source of water intrusion. (*See*, *e.g.*, *id.* at 144:1-145:7.) Poynor also conducted interviews of tenants at the Insured Properties about post-storm conditions, the timing of leaks, and whether any repairs had been made prior to his inspection. (*See*, *e.g.*, *id.* at 86:18-92:13.) Poyner explained that such interviews are standard industry practice, because property owners are generally the most knowledgeable individuals about pre-loss and post-loss conditions. (ECF 89-4, Poyner Report at 3.)

While Plaintiff's disclosure of the scope of Poyner's opinion fell short of what is required under Rule 26(a)(2)(B) – for retained experts, parties are required to provide "a complete statement of all opinions the witness will express and the basis and reasons for them" in their expert disclosures – in the absence of any indication that the inadequate disclosure reflected bad faith, the harsh sanction of preclusion under Rule 37 is not warranted. Defendant does not argue that Plaintiff's inadequate disclosure was a result of bad faith or disregard for the rules, and I have seen no evidence of bad faith. Nor has Defendant been prejudiced, in that Poynor's deposition put Defendant on notice of the details of his opinions on causation. Under the

43

circumstances, the deficient disclosure does not warrant preclusion of Poyner's testimony about causation. *See Olutosin*, 2019 WL 5616889, at *13.

Defendant goes on to argue that Poyner's causation opinions repeat the conclusions of Plaintiff's representatives "under the guise of expert opinion." (ECF 76, Def.'s *Daubert* Mem.at at 11.) Defendant is correct that, while experts may rely on interview with third parties in forming their opinions, it is well-established that they cannot merely regurgitate what third-parties have told them. *See Arista Recs. LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 424 (S.D.N.Y. 2009). But Poynor did more than simply recount the narratives of the tenants at the Insured Properties. His opinions were also grounded in photographic evidence, storm data, and personal experience. (*See*, *e.g.*, ECF 89-4, Poyner Report at 2.) The interviews provided additional factual details that informed his independent conclusions, rather than supplying the conclusions themselves. *See PRCM Advisers LLC v. Two Harbors Inv. Corp.*, No. 20-CV-5649 (LAK) (BCM), 2025 WL 1276513, at *26 (S.D.N.Y. May 2, 2025) (explaining that expert witnesses can testify to opinions based on hearsay or other inadmissible evidence if experts in the field reasonably rely on such evidence in forming their opinions).

Defendant's reliance on *405 Condo Associates LLC v. Greenwich Insurance. Co.*, is misplaced. *See* No. 11-CV-9662 (SAS), 2012 WL 6700225 (S.D.N.Y. Dec. 26, 2012). In that case, this Court precluded an engineer from testifying that a hurricane damaged a property's roof on reliability grounds for three reasons: (1) the engineer did not mention the material used in the flashing or attempt to approximate the wind speeds necessary to cause the damage; (2) the engineer did not provide his methodology for differentiating damage caused by the hurricane from prior damage; and(3) the engineer did not examine the roof until eight months after the

44

damage allegedly occurred. *See id.* at *5. These factors are not present in this case. Poynor

noted that materials used on at least some roofs (*see*, *e.g.*, ECF 89-3, Poynor Tr. at 144:1-145:7),

provided CoreLogic storm data confirming 2-inch hailstones and 80 mph winds on the date of

loss (*see* ECF 89-4, Poyner Report at 37-52), and conducted interviews with tenants and

representatives to differentiate between preexisting damage and damage caused by the April

2023 storm.

There is some caselaw suggesting that an expert's inspection that took place more than

two years after an incident renders the expert's opinion regarding the incident conclusory. *See,*

*e.g., Richards v. Pathmark Stores, Inc.,* No. 07-CV-1790 (THK), 2008 WL 3165582, at *5 (S.D.N.Y.

Aug. 6, 2008) (noting that, where four years had elapsed between the date of the incident and

the expert's site inspection, the expert's conclusion that the site had been slippery at the time

of the accident was not entitled to "much, if any,  weight," but declining to decide whether the

expert's opinion was admissible because such a decision was not necessary to the denial of the

defendant's summary judgment motion); *Kruimer v. Nat'l. Cleaning Contractors, Inc.,* 680

N.Y.S.2d 511, 511 (N.Y. App. Div. 1st Dept. 1998) (finding that an expert's opinion about the

existence of a slippery ground condition should have been ignored as conclusory because the

opinion was based on observations made more than two years after the accident); *Drillings v.*

*Beth Israel Med. Ctr.,* 606 N.Y.S.2d 191, 192 (N.Y. App. Div. 1st Dept. 1994) (finding that an

expert's opinion that the floor posed a hazardous condition was conclusory because the

opinion was based on an examination made two years after the accident). While Poynor

conducted his inspection in September 2024 (*see id*. at 2), which was more than a year after the

storm, absent evidence of an intervening hailstorm – which has not been provided – there is no

basis to conclude that evidence of storm damage would have changed significantly during the intervening period. Accordingly, I decline to exclude Poynor's causation opinions due to the passage of time between his site inspections and the storm.

Poyner's methodology was to apply his experience to data on the storm, what he observed on the roofs, and what the tenants told him. This methodology is similar to that of Defendant's experts, Verhulst and Truitt. Like Defendant's experts, Poynor inspected, observed, photographed, and measured the Insured Properties, consulted weather data, and used Xactimate to develop estimates of the cost of the losses. (*Compare* ECF 83, Truitt Decl. ¶¶ 3-4 *and* ECF 84-2, Verhulst Combined Reports at 5-12, 18 *with* ECF 89-4, Poynor Report at 2-4.) Accordingly, Poynor's conclusions "are based on more than subjective beliefs or unsupported speculation." *Park W. Radiology*, 675 F. Supp. 2d at 327. As such, his opinion regarding the causation is sufficiently reliable to withstand *Daubert* scrutiny.

Finally, Defendant argues that Poynor's causation opinions are unreliable because he conducted no destructive or moisture testing and never traced any particular leak to correlate the leak with any roof damage. (ECF 76, Def.'s *Daubert* Mem. at 5, 11.) But arguments that an expert's permissible methodology could have been improved by focusing on other factors and approaches go to the weight rather than the admissibility of the testimony. *See Better Holdco*, 666 F. Supp. 3d at 355. Defendant may cross examine Poynor about additional testing he did not perform. *See Park W. Radiology*, 675 F. Supp. 2d at 326.

****

For the reasons set forth above, Poynor's opinion on the cause of damage to the Insured Properties is sufficiently reliable; and Plaintiff sufficiently disclosed his opinion. Accordingly,

46

Defendant's motion to exclude Poynor's opinions is DENIED, in that Poynor's expert opinion on the causes of damage to the Insured Properties is not excluded.

### CONCLUSION

For the foregoing reasons:

- Plaintiff's motion to exclude Verhulst's report and testimony is GRANTED IN PART, in that Verhulst may not testify about the causes of the interior water damage at Location 10. The motion to exclude Verhulst's report and testimony is otherwise DENIED IN PART.

- Plaintiff's motion to exclude Truitt's report and testimony is GRANDTED IN PART, in that Truitt may not testify about the scope of damage to the Insured Properties. The motion to exclude Truitt's report and testimony is otherwise DENIED IN PART.

- Defendant's motion to exclude Largo's report and testimony is GRANTED IN PART, in that Largo may not testify about the causes of the interior water damage to the Insured Properties. The motion to exclude Largo's testimony is otherwise DENIED IN PART.

- Defendant's motion to exclude Poynor's report and testimony is DENIED.

Dated: January 16, 2026
      New York, New York

SO ORDERED.

_____
**ROBYN F. TARNOFSKY**
**United States Magistrate Judge**

47