UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

               :

DANABY RENTALS, INC.,                :

               :

           Plaintiff,         :

               :

       -v-              :          24 Civ. 3481 (JPC)

               :

               :          <u>OPINION AND ORDER</u>

MT. HAWLEY INSURANCE COMPANY,   :

               :

          Defendant.      :

               :

------------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

In this action, Danaby Rentals, Inc. ("Danaby") sues its insurer, Mt. Hawley Insurance Company ("Mt. Hawley"), to recover under their insurance policy for property damage allegedly caused by an April 2023 windstorm and hailstorm in south Texas. Danaby alleges breach of contract, a violation of the Texas Prompt Payment of Claims Act, and several theories of bad faith in handling an insurance claim under Texas law, and further seeks to recover its attorneys' fees. Mt. Hawley moves for summary judgment seeking dismissal of all of Danaby's claims, and Danaby moves for partial summary judgment on many of Mt. Hawley's affirmative defenses. To resolve these claims, the Court first addresses Danaby's challenges to enforcing the insurance policy's choice-of-law provision that selects New York law to govern it. Danaby contends that enforcing the provision violates Texas public policy and is unconstitutional under the Full Faith and Credit Clause and the Due Process Clause of the Fourteenth Amendment. For the reasons that

follow, the Court applies New York law to the contract claims, denies Mt. Hawley's summary judgment motion, and grants in part and denies in part Danaby's summary judgment motion.[1]

## I. Background

### A. Factual Background[2]

Danaby is a Texas corporation that owns numerous commercial properties in Hidalgo County, Texas. Dkt. 20 ("Am. Compl.") ¶ 1; Deft. 56.1 Stmt. ¶ 1. Ten of those properties—five located on Alberta Road in Edinburg (the "Alberta Sites"), three on West Nolana Loop in Pharr (the "Nolana Sites"), and two on West Canton Road in Edinburg (the "Canton Sites"; collectively with the Alberta Sites and the Nolana Sites, the "Properties")—were insured from August 2022 through August 2023 under an insurance policy issued by Mt. Hawley (the "Policy"). Pl. 56.1 Stmt. ¶¶ 1, 4.

Under the Policy, Mt. Hawley promised to "pay for direct physical loss of or damage to Covered Property . . . caused by or resulting from any Covered Cause of Loss," such as a

---

[1] The Court determines that oral argument is not necessary to resolve the motions for summary judgment and thus denies Danaby's request for oral argument, Dkt. 98.

[2] The following facts are drawn primarily from the parties' statements and counterstatements of undisputed material facts under Local Civil Rule 56.1(a), Dkt. 66 ("Deft. 56.1 Stmt."); Dkt. 69 ("Pl. 56.1 Stmt."); Dkt. 85 ("Deft. 56.1 Counter Stmt."); Dkt. 90 ("Pl. 56.1 Counter Stmt."); Dkt. 95 (Mt. Hawley's reply to Danaby's statement of additional facts), and the declarations filed by the parties with attached exhibits, Dkts. 71, 72 (collectively, "Gerguis First Aff."); Dkt. 73 ("Kotara Decl."); Dkt. 74 ("Smith Decl."); Dkt. 83 ("Truitt Decl."); Dkt. 84 ("Verhulst Decl."); Dkt. 92 ("Gerguis Second Aff."). Unless otherwise noted, the Court cites only to a party's statement of undisputed material facts when the opposing party does not dispute the fact, has not offered admissible evidence to refute it, or simply seeks to add its own "spin" on the fact or otherwise disputes the inferences drawn from it. Among the exhibits filed by the parties were transcript excerpts from depositions of Daniel Sandoval, Cord Largo, and Adam Kotara. Those deposition transcripts are referred to herein as follows: (1) Smith Decl., Exh. 2-A, and Gerguis Second Aff., Exh. G, collectively as "Sandoval Dep. Tr."; (2) Gerguis First Aff., Exh. 1-M, and Gerguis Second Aff., Exh. H, collectively as "Largo Dep. Tr."; and (3) Gerguis First Aff., Exh. 1-I, and Gerguis Second Aff., Exh. D, collectively as "Kotara Dep. Tr."

windstorm or hailstorm.  Gerguis First Aff., Exh. 1-A ("Policy") at MTH000158.[3]  The Policy did not, however, cover loss or damage to "[t]he interior of any building or structure, or to personal property in the building or structure, caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless: . . . [t]he building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters."  *Id.* at MTH000243.  The Policy's notice-of-occurrence provision obligated Danaby, in the event of "loss or damage caused by windstorm or hail," to give Mt. Hawley "prompt notice of the loss or damage" and "as soon as possible . . . a description of how, when and where the loss or damage occurred."  *Id.* at MTH000234.  The Policy's limit of insurance was $8,613,200, *id.* at MTH000150, and Danaby's deductible for windstorm or hailstorm damage was $25,000, *id.* at MTH000152.

The Policy also contained forum-selection and choice-of-law provisions.  *Id.* at MTH000236.  The parties agreed that Danaby "shall submit to the jurisdiction of a court of competent jurisdiction in the State of New York," and "[a]ny litigation commenced by [Danaby] . . . shall be initiated in New York."  *Id.*; *see also* Dkt. 10 (Order of the U.S. District Court for the Southern District of Texas granting Mt. Hawley's motion to transfer venue).  The choice-of-law clause provides that "[a]ll matters arising hereunder including questions relating to the validity, interpretation, performance and enforcement of this Policy shall be determined in accordance with the law and practice of the State of New York (notwithstanding New York's conflicts of law rules)."  Policy at MTH000236.

---

[3] The parties do not dispute that windstorms and hailstorms fall under a Covered Cause of Loss.  *See* Dkt. 68 ("Mt. Hawley SJ Motion") at 24; Dkt. 70 ("Danaby SJ Motion") at 12.

A windstorm and hailstorm blew through Edinburg and Pharr on April 28, 2023. Pl. 56.1 Stmt. ¶ 5. Over three months later, on August 3, 2023, Danaby's adjuster filed a claim under the Policy on its behalf for damage caused by that storm. *Id.* ¶ 8. The parties dispute many of the events that took place in the intervening period.

According to Danaby, business continued as usual at the ten Properties after the storm, though initially calls from tenants so "overwhelmed" Danaby that its team was unable to inspect its Properties. Sandoval Dep. Tr. at 63:5-64:4. Danaby's owner, Daniel Sandoval, contends that he did not observe any damage caused by the storm nor did anyone report damage to him. Gerguis Second Aff., Exh. A ("Sandoval Decl.") ¶ 5. In the months following the storm, tenants submitted routine maintenance requests, and Danaby performed regular upkeep, spending less than $10,000 on roof repairs in the period between the storm and filing its claim, an amount Sandoval considered "normal." *Id.* ¶¶ 5, 7. Only one complaint during this period described a ceiling leak, which was denoted as a "[p]ossible [air-conditioning] issue." Gerguis Second Aff., Exh. C ("Lozano Decl.") ¶ 7; Gerguis Second Aff., Exh. I ("Tenant Complaints") at 11 (email dated June 11, 2023, describing a "small leak coming from ceiling in hall[]way. Possible AC issue.").

Danaby used relatively informal processes for hiring and paying contractors. Danaby and its contractors tended not to exchange contracts or invoices; instead, when work was needed, Sandoval or one of his employees simply would call the contractor, who would then make the requested repairs. Sandoval Dep. Tr. at 47:10-48:1. Sandoval engaged several contractors on that basis between the storm and the filing of Danaby's claim, and no documents in the record describe the scope of those contractors' work. Danaby's payment records reflect that one contractor, Ruben Munoz, was paid out of the "Roofing" account fourteen times between April 28 and August 3. Gerguis Second Aff., Exh. J ("Check Register") at 20; *see* Sandoval Dep. Tr. at 45:3-46:24. On

4

May 5, 2023, Danaby paid another contractor, Edgar Perez, out of that Roofing account. Check Register at 22; *see* Sandoval Dep. Tr. at 48:16-49:9.

Danaby asserts that it did not learn about any damage attributable to the April 28th storm until approximately July 2023, when Cord Largo, one of Danaby's tenants and its public adjuster, told Sandoval about water stains in Largo's office. Pl. 56.1 Counter Stmt. ¶ 23; Largo Dep. Tr. at 37:4-18 (Largo stating that he saw water damage beginning in "Julyish" 2023). Sandoval immediately requested a full inspection, Pl. 56.1 Counter Stmt. ¶ 23, and hired Largo, through Largo's company, Under Paid Claim LLC, as Danaby's public insurance adjuster on August 1, 2023, Largo Dep. Tr. at 37:23-38:11; Pl. 56.1 Stmt. ¶ 7. Approximately two days later, Under Paid Claim notified Mt. Hawley, on Danaby's behalf, that Danaby was filing a claim under the Policy for damage reportedly caused by the April 28th storm. Pl. 56.1 Stmt. ¶ 8.

Mt. Hawley disputes the date that Danaby learned about storm damage to the Properties. Mt. Hawley asserts that Danaby discovered the damage on the day of the storm, pointing to Danaby's hiring of contractors to fix roofs in its immediate aftermath, the high volume of calls that Danaby's front office received, and deposition testimony suggesting Sandoval would have been told of such damage by his employee, Josy Lozano, Sandoval Dep. Tr. at 61:15-62:14. *See* Mt. Hawley SJ Motion at 20-21. In Mt. Hawley's telling, despite knowing of the storm damage shortly after the storm on April 28, 2023, Danaby did not file its insurance claim until August 3, 2023.

The events after Danaby filed that claim are not disputed. Mt. Hawley had an independent adjuster, Rodgers Truitt, inspect the properties; Truitt estimated less than $3,000 of wind and hail damage to their exteriors. Pl. 56.1 Stmt. ¶¶ 9-10. On August 25, 2023, Mt. Hawley partially denied Danaby's claim in a letter to Under Paid Claim, *id.* ¶ 13, stating that Mt. Hawley's "estimate

5

for the wind and hail damage totals $2,730.22," which did not meet the Policy's $25,000 deductible, and that five of the locations did "not meet the coinsurance requirements set forth in the [P]olicy." Kotara Decl., Exh. 1-E ("Aug. 25, 2023 Letter") at 2. The letter quoted several provisions of the Policy, such as its Exclusions, *see id.* at 4-5, and a section entitled "Duties In the Event Of Loss Or Damage," which obligated the insured, in the event of loss, to "[g]ive [Mt. Hawley] prompt notice of the loss or damage," and "[a]s soon as possible, give [Mt. Hawley] a description of how, when and where the loss or damage occurred," *id.* at 2. The letter further stated that Mt. Hawley was "not waiving [its] rights to assert any and all other rights or defenses under the [P]olicy or applicable law," and that "[t]his partial declination is made without prejudice to any defenses or rights that Mt. Hawley may have and without waiver of any of the terms, conditions, or provisions of th[e Policy]." *Id.* at 6. Finally, the letter invited Under Paid Claim to provide "additional information" that it believed Mt. Hawley should consider in its coverage analysis. *Id.*

In response, Under Paid Claim submitted damages estimates "purportedly for the cost of completely replacing all roofs and roof top HVAC units on the Properties and for alleged interior water damage." Kotara Decl. ¶ 8. Under Paid Claim produced those estimate reports by hiring an independent contractor to calculate the cost estimates on a software called Xactimate based on Largo's field notes and photographs he took at the Properties. Largo Dep. Tr. at 53:7-55:18 (describing how the contractor prepared the estimates). These estimates reflected that it would cost nearly $2 million to replace the roofs and repair the exteriors and interiors of the Properties. Pl. 56.1 Stmt. ¶¶ 17-18.

After receiving the cost estimates, Mt. Hawley decided to inspect the Properties further. It hired Stewart Verhulst, an engineer working for Nelson Forensics, to perform the additional

inspection. *Id.* ¶ 19. Verhulst produced a seventy-seven-page report on January 5, 2024, *id.*, and a supplemental report on January 17, 2024, *id.* ¶ 21. *See* Kotara Decl., Exh. 1-F ("Verhulst Reports"). Based on those reports, Truitt, Mt. Hawley's independent adjuster, revised his estimate of the covered loss, Pl. 56.1 Stmt. ¶ 22, and on January 26, 2024, Mt. Hawley sent Danaby a letter updating its estimate totals to $33,510.35, *id.* ¶ 23; *see* Kotara Decl., Exh. 1-H ("Jan. 26, 2024 Letter"). Despite the update, Mt. Hawley concluded that Danaby was not entitled to payment after applying a coinsurance penalty, depreciation, and the deductible. Pl. 56.1 Stmt. ¶ 24; Jan. 26, 2024 Letter at 6.

### B.    Procedural History

Danaby initiated this action in the U.S. District Court for the Southern District of Texas on March 12, 2024. Dkt. 1. On April 11, 2024, Mt. Hawley moved to transfer venue pursuant to 28 U.S.C. § 1404(a) based on the Policy's forum-selection clause, Dkt. 6, and filed an Answer, Dkt. 7 ("Answer"). On May 6, 2024, the Honorable Peter Bray granted the unopposed motion and transferred the case to the Southern District of New York, where it was assigned to the undersigned. Dkts. 10, 11. On May 7, 2024, the Court ordered Danaby to amend its Complaint to properly allege Mt. Hawley's citizenship and diversity jurisdiction. Dkt. 14 at 2. Danaby filed its Amended Complaint on May 14, 2024. Dkt. 20. The Amended Complaint alleges breach of contract; a violation of the Texas Prompt Payment of Claims Act, Tex. Ins. Code §§ 542.051 *et seq.*, by failing to timely pay for the storm damages; and bad faith under three theories of Section 541.060 of the Texas Insurance Code: misrepresenting to Danaby a material fact or policy provision relating to the coverage at issue, *id.* § 541.060(a)(1), failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim for which the insurer's liability had become reasonably clear, *id.* § 541.060(a)(2)(A), and failing to pay the claim without conducting

7

a reasonable investigation, *id.* § 541.060(a)(7). *See* Am. Compl. ¶¶ 29-36. Danaby alleges that Mt. Hawley "knowingly committed the acts complained of," entitling Danaby to exemplary or treble damages pursuant to Texas Insurance Code Section 541.152(a)-(b). *Id.* ¶ 35. Danaby also seeks attorneys' fees under Texas law. *Id.* ¶¶ 37-39.

On June 20, 2025, Mt. Hawley moved for summary judgment on all of Danaby's claims, Danaby moved for partial summary judgment on twenty-four of Mt. Hawley's thirty-one affirmative defenses, and both parties moved to exclude certain testimony of the other party's proffered experts under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Dkts. 65-68, 73-74 (Mt. Hawley's summary judgment motion); Dkts. 64, 69-72 (Danaby's partial summary judgment motion); Dkts. 75-77 (Mt. Hawley's *Daubert* motion); Dkts. 78-81 (Danaby's *Daubert* motion). The parties filed oppositions on July 11, 2025. Dkts. 82-85 (Mt. Hawley's opposition to Danaby's summary judgment motion); Dkts. 86-87 (Mt. Hawley's opposition to Danaby's *Daubert* motion); Dkts. 88-89 (Danaby's opposition to Mt. Hawley's *Daubert* motion); Dkts. 90-92 (Danaby's opposition to Mt. Hawley's summary judgment motion). Replies were filed on July 18, 2025. Dkt. 93 (Mt. Hawley's *Daubert* motion reply); Dkt. 94 ("Mt. Hawley SJ Motion Reply"); Dkt. 96 (Danaby's *Daubert* motion reply); Dkt. 97 ("Danaby SJ Motion Reply"). The Honorable Robyn F. Tarnofsky, to whom this case was referred for general pretrial supervision, ruled on the parties' *Daubert* motions on January 16, 2026. Dkt. 101 ("*Daubert* Opinion").

## II. Legal Standard

The Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate '[w]here the record taken as a whole could not

8

lead a rational trier of fact to find for the non-moving party.'" *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 620 (2d Cir. 2016) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "A genuine dispute exists where 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,' while a fact is material if it 'might affect the outcome of the suit under the governing law.'" *Chen v. 2425 Broadway Chao Rest., LLC*, No. 16 Civ. 5735 (GHW), 2019 WL 1244291, at *4 (S.D.N.Y. Mar. 18, 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In conducting this review, the Court "resolve[s] all ambiguities and draw[s] all reasonable inferences in favor of the nonmoving party." *Mhany Mgmt.*, 819 F.3d at 620.

"The movant bears the initial burden of demonstrating 'the absence of a genuine issue of material fact,' and, if satisfied, the burden then shifts to the non-movant to present 'evidence sufficient to satisfy every element of the claim.'" *Chen*, 2019 WL 1244291, at *4 (quoting *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008)). The non-movant "may not rely on conclusory allegations or unsubstantiated speculation," and "must offer some hard evidence showing that its version of the events is not wholly fanciful." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (citation modified). The non-movant must present more than a "scintilla of evidence" to survive summary judgment. *Anderson*, 477 U.S. at 252. "Where no rational finder of fact 'could find in favor of the nonmoving party because the evidence to support its case is so slight,' summary judgment must be granted." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (quoting *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010)).

Lastly, "even if the court does not grant summary judgment co-extensive with the relief sought by either movant, it may provide partial relief. That relief may be as limited as a declaration that one or more material facts are 'not genuinely in dispute' and that those facts are deemed

9

'established in the case.'" *Chen v. New Trend Apparel, Inc.*, 8 F. Supp. 3d 406, 431 (S.D.N.Y. 2014) (adopted report and recommendation) (quoting Fed. R. Civ. P. 56(g)).

### III.  Applicable Law for Danaby's Contract Claim

The Policy contains a choice-of-law clause providing that New York law shall govern "[a]ll matters arising hereunder including questions relating to the validity, interpretation, performance and enforcement of this Policy . . . (notwithstanding New York's conflicts of law rules)."  Policy at MTH000236.  The Texas Insurance Code, however, provides that Texas law governs insurance contracts payable to citizens or inhabitants of Texas by an insurance company doing business there. Tex. Ins. Code art. 21.42; *id.* § 982.303.[4]  Mt. Hawley seeks to enforce the Policy under New York law, whereas Danaby contends that Texas's public policy voids the Policy's choice-of-law provision and requires application of Texas law.  Dkt. 91 ("Opp. to Mt. Hawley SJ Motion") at 6-8.  Applying New York law, Danaby argues, would violate the Full Faith and Credit Clause, U.S. Const. art. IV, § 1, and the Due Process Clause of the Fourteenth Amendment, *id.* amend. XIV, § 1.  Opp. to Mt. Hawley SJ Motion at 8-11.  The initial questions thus are whether New York or Texas law applies to Danaby's contract claim and, if New York law applies, whether that application violates the Constitution.

### A.    New York Law Governs the Policy.

The Court must perform a choice-of-law analysis with respect to Danaby's contract claim because Texas and New York laws are in "actual conflict." *Fin. One Pub. Co. Ltd. v. Lehman*

---

[4] Article 21.42 provides that "[a]ny contract of insurance payable to any citizen or inhabitant of [Texas] by any insurance company or corporation doing business within [Texas] shall be held to be a contract made and entered into under and by virtue of the laws of [Texas] relating to insurance, and governed thereby."  Tex. Ins. Code art. 21.42.  Section 982.303 provides that "[a] foreign or alien insurance company that issues a contract or policy in [Texas] is considered to have agreed to comply with this code as a prerequisite to engaging in the business of insurance in this state."  *Id.* § 982.303.

*Bros. Special Fin., Inc.*, 414 F.3d 325, 331 (2d Cir. 2005) (citation modified).  Mt. Hawley argues

that Danaby failed to satisfy a condition to coverage under the Policy by not providing prompt

notice of any loss or damage.  Mt. Hawley SJ Motion at 16-21.  In Texas, an insurer may disclaim

coverage based on a notice defect only after showing that it was prejudiced by the defect.  *PAJ,*

*Inc. v. Hanover Ins. Co.*, 243 S.W.3d 630, 636-37 (Tex. 2008).  By contrast, New York's common

law does not require a showing of prejudice for an insurer to disclaim coverage based on untimely

notice for claims under policies that were not issued within the state.  *Indian Harbor Ins. Co. v.*

*City of San Diego*, 586 F. App'x 726, 728-29 (2d Cir. 2014) (summary order) (explaining that New

York Insurance Law Section 3420(a)(5), which requires a showing of prejudice for insurance

policies "issued or delivered" in New York, does not abrogate the common-law no-prejudice rule);

*see also Booking v. Gen. Star Mgmt. Co.*, 254 F.3d 414, 420-21 (2d Cir. 2001) (describing Texas

law and New York law as "arguably a bit different" based on the contrasting prejudice

requirements).[5]

　　"It is well established that a federal court sitting in diversity must generally apply the choice

of law rules of the state in which it sits."  *In re Coudert Bros. LLP*, 673 F.3d 180, 186 (2d Cir.

2012).  But when an action is transferred to another venue pursuant to 28 U.S.C. § 1404(a), "the

state law applicable in the original court also appl[ies] in the transferee court."  *Atl. Marine Constr.*

*Co., Inc. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 65 (2013).  An exception to that

exception arises, however, where the original court transferred venue based on a forum-selection

---

[5] The Second Circuit has explained that the differences between the two jurisdictions' laws "must have a significant *possible* effect on the outcome of the trial."  *Fin. One Pub. Co.*, 414 F.3d at 331 (citation modified).  Because the Court finds that there is a genuine dispute of material fact as to when Danaby learned that it might have an insurance claim, *see infra* IV.A, and therefore as to whether Mt. Hawley is relieved from its contractual obligations based on Danaby's untimely notice, whether Mt. Hawley was prejudiced by any untimely notice could affect this case's outcome.

clause, because "a plaintiff who files suit in violation of a forum-selection clause" should not "enjoy[]" the "'privilege'" of the original forum's law. *Id.* (quoting *Van Dusen v. Barrack*, 376 U.S. 612, 635 (1964)). Accordingly, "when a transfer stems from enforcement of a forum-selection clause," the "court in the contractually selected venue should not apply the law of the transferor venue to which the parties waived their right." *Id.* at 65-66. This action was transferred to this District by virtue of the Policy's forum-selection clause. *See* Dkt. 10 (Order of the U.S. District Court for the Southern District of Texas granting motion to change venue citing the Policy's "binding and valid forum selection clause requiring all litigation under the policy be initiated in New York"). New York thus supplies the choice-of-law rules.

The Court begins with whether the Policy's choice-of-law clause is void, as Danaby contends. *See* Opp. to Mt. Hawley SJ Motion at 6-8. "The validity of a contractual choice-of-law clause is a threshold question that must be decided not under the law specified in the clause, but under the relevant forum's choice-of-law rules governing the effectiveness of such clauses." *Fin. One Pub. Co.*, 414 F.3d at 332. As noted, New York is the relevant forum.

New York's choice-of-law rules direct the Court to uphold the clause's validity, and, therefore, the parties' selection of New York law. "Historically, New York courts faced with a choice-of-law provision would nevertheless 'conduct a conflicts analysis and apply the law of the jurisdiction with "the most significant relationship to the transaction and the parties."'" *Stevens & Co. LLC v. Espat*, No. 24 Civ. 5223 (LJL), 2025 WL 950989, at *6 (S.D.N.Y. Mar. 28, 2025) (quoting *IRB-Brasil Resseguros, S.A. v. Inepar Invs., S.A.*, 982 N.E.2d 609, 611 (N.Y. 2012)). Such analyses created uncertainty for parties that had chosen New York law to govern their contracts, so to restore predictability and "protect New York's status as a commercial center," the state legislature enacted General Obligations Law Section 5-1401. *Id.* Section 5-1401 provides

that the parties to a contract involving a transaction worth $250,000 or more "may agree that the law of this state shall govern their rights and duties in whole or in part, whether or not such contract, agreement or undertaking bears a reasonable relation to this state."  N.Y. Gen. Oblig. L. § 5-1401; *see IRB-Brasil Resseguros*, 982 N.E.2d at 611; *see also Ministers & Missionaries Benefit Bd. v. Snow*, 45 N.E.3d 917, 922 (N.Y. 2015) ("New York courts should not engage in any conflicts analysis where the parties include a choice-of-law provision in their contract, even if the contract is one that does not fall within General Obligations Law § 5-1401.").  Section 5-1401 thus "dictates that New York substantive law applies when parties include an ordinary New York choice-of-law provision . . . in their contracts."  *IRB-Brasil Resseguros*, 982 N.E.2d at 612.  Indeed, for contracts involving transactions exceeding $250,000 that select New York law to govern them, New York's choice-of-law rules direct courts not to conduct a choice-of-law analysis at all.  *Id.* (explaining that "engag[ing] in a conflict-of-laws analysis despite the parties' plainly expressed desire to apply New York law would frustrate the Legislature's purpose of encouraging a predictable contractual choice of New York commercial law and, crucially, of eliminating uncertainty regarding the governing law"); *see Stevens & Co.*, 2025 WL 950989, at *8 n.6 (stating that Section 5-1401 requires "enforcement of a New York choice-of-law clause which lacks any relationship to the transaction" for transactions exceeding $250,000).[6]  The parties do not dispute that the Policy's aggregate transaction value exceeds $250,000, so it falls squarely within the scope of Section 5-1401.  *See* Policy at MTH000150 (stating the Policy's limit totals $8,613,200); *see also*

---

[6] Courts in this District divide over the proper interpretation of New York's choice-of-law rules with respect to transactions not covered by Section 5-1401 and particularly the breadth of the holding of the New York Court of Appeals in *Ministers & Missionaries Benefit Board*.  *See Stevens & Co.*, 2025 WL 950989, at *6-9; *Willis Re Inc. v. Herriott*, 550 F. Supp. 3d 68, 91-96 (S.D.N.Y. 2021).  The parties wade into this debate, Mt. Hawley SJ Motion at 10-14; Opp. to Mt. Hawley SJ Motion at 6-8, but the Court need not because it finds that Section 5-1401 covers the Policy.

*Esplanade 2018 Partners, LLC v. Mt. Hawley Ins. Co.*, No. 23 Civ. 3592 (DEH), 2025 WL 844021, at *5 (S.D.N.Y. Mar. 18, 2025); *La. Revitalization Fund LLC v. Starr Surplus Lines Ins. Co.*, No. 23 Civ. 1006 (VSB) (VF), 2024 WL 1337617, at *4 (S.D.N.Y. Mar. 27, 2024) (report and recommendation).

Danaby argues that the Policy's choice-of-law clause cannot fall within the scope of Section 5-1401 because it is void *ab initio* due to Texas public policy "prohibit[ing] surplus lines insurers" like Mt. Hawley "from contracting around Texas's mandatory insurance laws" that require Texas law to govern insurance contracts like the Policy. Opp. to Mt. Hawley SJ Motion at 6; *see* Tex. Ins. Code art. 21.42. In support, Danaby cites a U.S. Supreme Court case, a Second Circuit case, and a case from the New York Supreme Court, Appellate Division. Opp. to Mt. Hawley SJ Motion at 6-7. All three decisions are inapposite and do not overcome well-established law instructing how courts should conduct choice-of-law analyses.

Although the cited Supreme Court case, *New York Life Insurance Co. v. Cravens*, 178 U.S. 389 (1900), does not concern New York law, Danaby suggests that it bars the Court from applying New York's substantive law to the Policy. *See* Opp. to Mt. Hawley SJ Motion at 6-7. But that misreads the precedent. *Cravens* considered whether Missouri courts could enforce a Missouri statute to void a forfeiture provision in a life insurance contract that contained a New York choice-of-law clause, but was negotiated and delivered in Missouri. 178 U.S. at 395-96. The insurer argued that the Missouri courts, by applying Missouri law to the contract, violated the Due Process Clause by denying its "contractual liberty" to select New York law. *Id.* at 398. The Supreme Court disagreed and affirmed the Missouri high court's ruling "annul[ling] the provisions of the policy which contravene the statute." *Id.* at 395. *Cravens* thus shows that a forum need not turn a blind eye to its own public policy when faced with a contract's choice-of-law provision selecting

14

another forum's law.  But that decision says nothing about the question before this Court: when a contract selects the law of the forum where the court sits, must that court favor another forum's public policy over that of its forum to void that selection, even if doing so contravenes its forum's law?

The next case Danaby cites, *Dukes Bridge LLC v. Security Life of Denver Insurance Co.*, Nos. 20-2687-cv L; 20-2826-cv; 20-2909-cv, 2021 WL 5986871 (2d Cir. Dec. 17, 2021) (summary order), is similarly off point.  Whereas *Cravens* shows that a state *may* choose to apply its public policy to a contract notwithstanding a choice-of-law clause, *Dukes Bridge* instructs that New York courts *must* do so.  There, the Second Circuit explained that, as a matter of New York's choice-of-law rules, New York substantive law must "govern[] when the parties' own choice of law would violate New York's public policy."  *Id.* at *1.  Accordingly, the Second Circuit held that a New York statute requiring insurance policies delivered in New York to be governed by New York law overrode the parties' selection of New Jersey law.  *Id.* at *1-2.  Like *Cravens*, the analysis in *Dukes Bridge* does not reach whether a New York court must invoke another state's public policy to void a choice-of-law provision that selects New York law.

Finally, Danaby relies on *North American Elite Insurance Co. v. Space Needle, LLC*, 159 N.Y.S.3d 396 (1st Dep't 2021), an opinion of the Appellate Division, First Department, that conflicts with prior and subsequent decisions by the New York Court of Appeals.  The First Department in *Space Needle* did not discuss Section 5-1401 or the interpretation of that statute by the New York Court of Appeals in *IRB-Brasil Resseguros*.  Since *Space Needle* was decided, the New York Court of Appeals has reaffirmed that including a "New York choice-of-law clause in a contract demonstrates the parties' intent that courts not conduct a conflict-of-laws analysis, which thereby obviates the application of both common-law conflict-of-laws principles and statutory

15

choice-of-law directives." *Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 235 N.E.3d 949, 955 (N.Y. 2024) (citation modified); *see also Levin v. Tiber Holding Corp.*, 277 F.3d 243, 253 (2d Cir. 2002) (stating that federal courts sitting in diversity applying New York law "must follow the holdings of the New York Court of Appeals and . . . reject inconsistent rulings from its lower courts").

The Court is not aware of any binding or persuasive authority that supports Danaby's view that New York's choice-of-law rules allow another state's public policy to invalidate a choice-of-law clause that selects New York law to govern the contract. Such an approach would undermine Section 5-1401's aim of "encouraging a predictable contractual choice of New York commercial law and, crucially, . . . eliminating uncertainty regarding the governing law." *IRB-Brasil Resseguros*, 982 N.E.2d at 612; *cf. Capstone Logistics Holdings, Inc. v. Navarette*, No. 17 Civ. 4819 (GBD), 2018 WL 6786338, at *22 (S.D.N.Y. Oct. 25, 2018) (inquiring into the public policy of only New York "because a requirement that New York courts consider the fundamental public policy of a *foreign law* would swallow whole the *Ministers* holding that courts need not engage in conflicts analysis"). Indeed, case law overwhelmingly points to the opposite conclusion: "New York courts consider only New York public policy when making choice of law decisions, not the public policies of other jurisdictions," *Home Ins. Co. v. Appleton Papers, Inc.*, No. 99 Civ. 3169 (RCC), 2002 WL 22024, at *6 (S.D.N.Y. Jan. 8, 2002) (collecting cases), including when they review the terms of insurance contracts. *See, e.g.*, *HKB Hosp. LLC v. Mt. Hawley Ins. Co.*, No. 23 Civ. 372 (JPO), 2024 WL 4349508, at *1-2 (S.D.N.Y. Sept. 30, 2024) (honoring the same choice-of-law language at issue in this case notwithstanding the Texas Insurance Code); *CBKZZ Inv. LLC v. Renaissance Re Syndicate 1458 Lloyds*, 22 Civ. 10672 (AS), 2024 WL 728890, at *2 (S.D.N.Y. Feb. 22, 2024) (applying New York's choice-of-law rules to an insurance policy solicited,

16

negotiated, and delivered in Texas); *Ram Krishana, Inc. v. Mt. Hawley Ins. Co.*, No. 22 Civ. 3803 (JLR), 2024 WL 1657763, at \*2 (S.D.N.Y. Apr. 17, 2024) (same, though involving Louisiana instead of Texas).  The Court thus joins multiple others in this District in holding that "a New York choice of law clause in an insurance policy must be enforced notwithstanding a statute in the insured's home state voiding such clauses."  *My Invs. LLC v. Starr Surplus Lines Ins. Co.*, No. 23 Civ. 4229 (VEC), 2024 WL 4859027, at \*3 (S.D.N.Y. Nov. 20, 2024) (collecting cases); *see Berkley Assurance Co. v. MacDonald-Miller Facility Sols., Inc.*, No. 19 Civ. 7627 (JPO), 2019 WL 6841419, at \*2-3 (S.D.N.Y. Dec. 16, 2019) (applying Section 5-1401 to conclude that an insurance policy's choice-of-law clause was valid and mandated the application of New York law).

Accordingly, pursuant to Section 5-1401, the Policy's choice-of-law provision is valid and the Court must interpret the Policy under New York law.

### B. The Full Faith and Credit Clause and the Due Process Clause Do Not Bar the Application of New York Law.

Danaby next argues that the U.S. Constitution bars the Court from applying New York law because this dispute's only pre-litigation contacts with New York were the Policy's choice-of-law and forum-selection clauses.  Opp. to Mt. Hawley SJ Motion at 10-13.  The Second Circuit has explained that "New York is free to apply its own choice of law rule, subject only to the full faith and credit and due process limitations that it may not apply the law of a jurisdiction lacking a significant relation to the litigation."  *Travelers Indem. Co. v. Sarkisian*, 794 F.2d 754, 762 (2d Cir. 1986).  Danaby's constitutional challenge thus requires the Court to determine whether the Full Faith and Credit and Due Process Clauses permit it to apply New York substantive law to a contract claim when the contracting parties selected New York as providing the contract's governing law and as the forum for any litigation, but those parties otherwise lack a connection to

New York.  The Court concludes that enforcing the Policy's choice-of-law provision does not run afoul of either Clause.

The Full Faith and Credit Clause[7] promotes federalism by barring a state's choice of law that "threatens the federal interest in national unity by unjustifiably infringing upon the legitimate interests of another State."  *Franchise Tax Bd. of Calif. v. Hyatt*, 578 U.S. 171, 180 (2016) (quoting *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 323 (1981) (Stevens, J., concurring in the judgment)). That concern for comity nevertheless "does not require a State to substitute for its own statute, applicable to persons and events within it, the statute of another State reflecting a conflicting and opposed policy," so long as the first state has "'not adopted any policy of hostility'" to the laws of the other state.  *Id.* at 176 (alteration adopted) (quoting *Carroll v. Lanza*, 349 U.S. 408, 412-13 (1955)).  The Fourteenth Amendment's Due Process Clause[8] protects individuals' rights by "prohibit[ing] the application of law which was only casually or slightly related to the litigation." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 819 (1985); *see Hague*, 449 U.S. at 320 (Stevens, J., concurring in the judgment) (distinguishing the Full Faith and Credit Clause's "federal interest" in having states respect one another's sovereignty from the Due Process Clause's protection of "litigants' interests in a fair adjudication of their rights").

Though each Clause furthers a distinct interest, courts nevertheless analyze their "modest restrictions on the application of forum law" under a single framework.  *Shutts*, 472 U.S. at 818; *see Hague*, 449 U.S. at 321-22 (Stevens, J., concurring in the judgment).  Thus, to apply New

---

[7] The Full Faith and Credit Clause provides that "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State.  And the Congress may by general Laws prescribe the Manner in which such Acts, Records, and Proceedings shall be proved, and the Effect thereof."  U.S. Const., art. IV, § 1.

[8] The Due Process Clause of the Fourteenth Amendment provides that no State "shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const., amend. XIV, § 1.

York's substantive law "in a constitutionally permissible manner, [New York] must have [1] a significant contact or significant aggregation of contacts, [2] creating state interests, such that [3] choice of its law is neither arbitrary nor fundamentally unfair." *Shutts*, 472 U.S. at 818 (citation modified); *see id.* at 822 (holding that Kansas's lack of interest in the class-action plaintiffs' claims unrelated to that state rendered applying Kansas law to those claims arbitrary and unfair).

Mt. Hawley points to one case that upheld the constitutionality of applying New York law based solely on a contract's choice-of-law clause. *See U.S. Rubber Corp. v. Mt. Hawley Ins. Co.*, No. 23 Civ. 7618 (AT), 2024 WL 5268848, at *3 (S.D.N.Y. Dec. 31, 2024) (calling a choice-of-law clause "not an insignificant contact"). The Court is not aware of any other case addressing the constitutional implications where the facts were on all fours with those presented here. To be sure, courts in this District have upheld the constitutionality of enforcing New York choice-of-law clauses where at least one of the contracting parties had additional contacts with New York, such as having an office in New York or engaging in activities there. *See, e.g.*, *Indian Harbor Ins. Co. v. City of San Diego*, 972 F. Supp. 2d 634, 653-54 (S.D.N.Y. 2013) (listing as contacts for constitutional purposes: the contract's choice-of-law and forum-selection clauses, as well as the insurer's New York office where its CEO, general counsel, and half of its corporate directors worked), *aff'd on other grounds*, 586 F. App'x at 730; *Lehman Bros. Com. Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*, 179 F. Supp. 2d 118, 137-38 (S.D.N.Y. 2000) (finding constitutionally sufficient contact where the contract had a choice-of-law provision selecting New York law, the plaintiff's headquarters were in New York, and "the transactions and payments occurred, at least in part, in New York"); *Simon v. Philip Morris Inc.*, 124 F. Supp. 2d 46, 70 (E.D.N.Y. Dec. 7, 2000) (finding constitutionally sufficient contact where the defendants' headquarters and principal places of business were in New York, the activities related to their

alleged conspiracy took place there, and the defendants sold substantial amounts of cigarettes there).  And other courts have applied New York law when its sole contact with the dispute was, like here, on paper—*i.e.*, a contract's choice-of-law and forum-selection clauses—without being presented with a constitutional challenge.  *See, e.g.*, *Esplanade 2018 Partners*, 2025 WL 844021, at \*5; *Certain Underwriters at Lloyd's v. New Dominion, LLC*, No. 16 Civ. 5005 (DLC), 2016 WL 4688866, at \*4 (S.D.N.Y. Sept. 7, 2016); *see also CBKZZ Inv.*, 2024 WL 728890, at \*1-2 (mentioning only the choice-of-law clause); *10110 Grp., LLC v. Mt. Hawley Ins. Co.*, No. 23 Civ. 7179 (JMF), 2025 WL 415737, at \*1-2 (S.D.N.Y. Feb. 6, 2025) (same); *cf. Cajun Conti, LLC v. Starr Surplus Lines Ins. Co.*, No. 23 Civ. 8844 (KPF), 2025 WL 764131, at \*2, \*4-5 (S.D.N.Y. Mar. 11, 2025) (applying New York law where the defendant's headquarters were located in New York).

The Court's survey of the relevant jurisprudence indicates that the Policy's choice-of-law and forum-selection clauses constitute sufficient contact with New York to support that state's interest in applying its law.  *See Shutts*, 472 U.S. at 818-19.  Selecting New York law implicates "policies that are vitally important not only to [the] contracting parties" who opted into it, "but also to New York," such as "promoting New York's status as an international financial center and providing a stable body of law" by which parties may "structure their transactions and disputes." *Indian Harbor Ins.*, 972 F. Supp. 2d at 653 (citation modified).  Notwithstanding the apparent strength of Texas's interests in regulating the insurance industry within its borders, "it is not for the Court to balance those interests against New York's."  *Id.*  The Supreme Court long ago abandoned the "complex balancing-of-interests approach to conflicts of law under the Full Faith and Credit Clause" which "led to results that seemed to differ depending" on the subject-matter of the case.  *Franchise Tax Bd. of Calif.*, 578 U.S. at 179 (citation modified) (listing "insurance

20

claims" among the subjects that had previously affected the analysis).  And New York's interest in affording predictability to parties who select its law to govern their agreements is a far cry from a "policy of hostility to the public Acts of a sister State," which the Full Faith and Credit Clause prohibits.  *Franchise Tax Bd. of Calif. v. Hyatt*, 538 U.S. 488, 499 (2003) (quoting *Carroll*, 349 U.S. at 413); *see Franchise Tax Bd. of Calif.*, 578 U.S. at 178-79 (holding that Nevada violated the Full Faith and Credit Clause by applying special rules for damages awards against California that conflicted with general principles of Nevada immunity law).

Neither does applying New York law violate the parties' due process rights, *i.e.*, the interest that the *Shutts* standard's third element protects.  *Shutts*, 472 U.S. at 818.  "[I]t is hardly unfair or arbitrary to honor the contractual choice of the parties in a substantial transaction."  *Indian Harbor Ins.*, 972 F. Supp. 2d at 652.  The parties' expectations are "an important element" when considering fairness.  *Shutts*, 472 U.S. at 822; *see Hague*, 449 U.S. at 333 (Powell, J., dissenting) (calling "the reasonable expectation of the parties" the "touchstone" of the fairness inquiry); *Lehman Bros. Com.*, 179 F. Supp. 2d at 137 (distinguishing a court's power to apply the forum's law by virtue of "the parties' own contractual choice" as opposed to when a state has "*no* connection to either the parties or the transactions").  A forum unconstitutionally frustrates a party's expectations when, for example, the forum applies its law to a contract that was negotiated, executed, and performed entirely elsewhere and that selected a different forum's law to govern it. *See Home Ins. Co. v. Dick*, 281 U.S. 397, 408-10 (1930).  By contrast, parties' assent to the forum's law and jurisdiction strongly indicates their expectations.  *See Hague*, 449 U.S. at 317 n.23 (plurality opinion) (calling "jurisdiction" a "factor not without significance in assessing the constitutionality" of a state's "choice of its own substantive law").

For similar reasons, there is little suggestion that applying New York law would constitute "unfair surprise or frustration of legitimate expectations." *Id.* at 318 n.24. Danaby and Mt. Hawley's expectations can be inferred not only from their assent to the Policy's choice-of-law clause, but also to its forum-selection provision. Policy at MTH000236 (providing that Danaby "shall submit to the jurisdiction of a court of competent jurisdiction in the State of New York" and commence any litigation in New York). The latter assent especially indicates that the parties "invoke[d] the benefits and protections of New York law," and that Danaby agreed to be subject to the state's jurisdiction. *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 23 (2d Cir. 2004); *see D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 103 (2d Cir. 2006) (stating that "[p]arties can consent to personal jurisdiction through forum-selection clauses"). If anything, it would be unexpected to set aside the choice-of-law provision given the well-settled law upholding such clauses. *See Atl. Marine Constr.*, 571 U.S. at 66 ("In all but the most unusual cases . . . the interest of justice is served by holding parties to their bargain." (citation modified)). And as in *Hague*, here personal jurisdiction is "unquestioned." 449 U.S. at 317 n.23.

Danaby urges the Court to depart from *U.S. Rubber* and instead hold that the Policy is insufficiently connected to New York to satisfy the Constitution's "modest" requirements for applying New York law, *Shutts*, 472 U.S. at 818. Opp. to Mt. Hawley SJ Motion at 13. The Court declines to do so. First, Danaby has not cited a single case that bars the forum state from applying its own law based on a choice-of-law provision. *See generally id.* It relies on one case, *Watson v. Employers Liability Assurance Corporation*, 348 U.S. 66 (1954), as an example of the Supreme Court upholding a state's "application of its insurance law to an out-of-state policy[] because the risk and injury occurred in" that state. Opp. to Mt. Hawley SJ Motion at 11. But *Watson* does not deal with choice-of-law clauses. There, a products-liability plaintiff injured in Louisiana brought

22

a direct-action suit in Louisiana state court against the manufacturer's insurer. *Watson*, 348 U.S. at 67. Louisiana law allowed plaintiffs injured there to bring direct actions, but the policy at issue contained a provision, "recognized as binding and enforceable" in two other states, that barred them. *Id.* at 68. The Supreme Court held that the Due Process and Full Faith and Credit Clauses neither blocked Louisiana from applying its law nor compelled it to apply the law of the other two states. *Id.* at 73. Applying Louisiana law did not offend the insurer's rights under the Due Process Clause because states have a right to regulate business activities to protect their citizens "even though other phases of some transactions might justify regulatory legislation in other states." *Id.* at 72. Moreover, Louisiana's "vital interest[]" in "safeguarding the rights of persons injured there" outweighed whatever interest the other states had, so "the Full Faith and Credit Clause [did] not compel Louisiana to subordinate its direct action provision to" the contract rules of any other state. *Id.* at 73.[9] To the degree *Watson* is at all apposite, its holding reflects the standard that *Shutts* later articulated: where there is a sufficient connection between a forum state and a transaction, the forum state accrues interests that make applying its law to the dispute neither arbitrary nor unfair, and thus consistent with the Due Process and Full Faith and Credit Clauses.

Danaby also argues that applying a choice-of-law provision like the one in the Policy would enable insurers to "manufacture jurisdiction" and circumvent public law "by routing disputes through New York courts under preselected New York law." Opp. to Mt. Hawley SJ Motion at 12. But this overlooks that parties are free to agree, and not to agree, to "invoke the benefits and protections of New York law." *Sunward Elecs.*, 362 F.3d at 23. Parties are just as free to agree to

---

[9] *Watson* reflects a "weighing-of-interests" approach to analyzing the Full Faith and Credit Clause that the Supreme Court has since abandoned. *Hague*, 449 U.S. at 308 n.10. The Supreme Court now employs "a similar approach in deciding choice-of-law cases under both the Due Process Clause and the Full Faith and Credit Clause. In each instance, the Court has examined the relevant contacts and the resulting interests of the State whose law was applied." *Id.*

23

transact under another state's law, and other states may choose to adopt New York's approach of categorically enforcing choice-of-law clauses that select their law. When Danaby and Mt. Hawley agreed to adjudicate their dispute in New York and under New York law, they deliberately tied their transaction to New York and triggered New York's interests. Nothing bars this Court from protecting those interests by applying New York's substantive law consistent with the parties' wishes.

Accordingly, applying New York law based on the Policy's choice-of-law provision offends neither Danaby's right to due process of law nor New York's obligation to give full faith and credit to the laws of Texas. The parties agreed that New York law would govern their Policy and that they would adjudicate this dispute in a New York court, creating a relationship with New York well before this litigation. *See Dick*, 281 U.S. at 408-10 (holding that the Fourteenth Amendment prohibits Texas courts from applying Texas law to a dispute that, in contrast with this case, had no contact with the forum "except . . . in the bringing of [that] suit"). New York has an interest in predictably enforcing contracting parties' choice to apply its commercial law. Doing so when parties agree to select its law and litigate in its courts is "neither arbitrary nor fundamentally unfair," *Shutts*, 472 U.S. at 818 (citation modified), nor does it "abrogate the rights of parties beyond" New York's borders who had no connection to that state before the litigation, *id.* at 822 (quoting *Dick*, 281 U.S. at 410).

* * *

New York's choice-of-law rules direct the Court to apply New York substantive law to the Policy. By virtue of its choice-of-law and forum-selection provisions, the Policy is sufficiently connected to New York to satisfy the Full Faith and Credit Clause and the Fourteenth Amendment. Accordingly, the Court applies New York law to Danaby's breach-of-contract claim. As for

24

Danaby's claims for torts incidental to the contract, the Court performs New York's choice-of-law analysis, as further discussed below. *See infra* IV.C.

## IV.  Discussion

Mt. Hawley moves for summary judgment on all of Danaby's claims.  According to Mt. Hawley, Danaby's breach-of-contract claim fails as a matter of law because Danaby violated the Policy's condition that it provide "prompt notice" of its insurance claim, and even if notice was timely, Danaby has not proffered evidence for any reasonable juror to find that the April 28th storm caused the alleged damage.  Mt. Hawley SJ Motion at 16-21, 24-25.  Mt. Hawley contends that Danaby's claims for bad faith damages and attorneys' fees fail because they are brought under Texas statutes that are not cognizable under New York law.  *Id.* at 21-24.

Danaby in turn seeks partial summary judgment on twenty-four of Mt. Hawley's affirmative defenses.  Danaby SJ Motion at 8.  Mt. Hawley has withdrawn six of those defenses and concedes that it has not adequately pleaded another two of them.  *See* Dkt. 82 ("Opp. to Danaby SJ Motion") at 14.  That leaves for the Court's consideration Mt. Hawley's affirmative defenses concerning the Policy's deductible (Affirmative Defense No. 2) and coverage limits (No. 3), its coinsurance calculations (No. 4), its exclusions for damage resulting from certain specific causes (Nos. 7, 8, 9, and 12), its exclusions for replacement cost coverage of roof surfacing over fifteen years old (No. 10), the timing of Danaby's claim notice (No. 13), Danaby's alleged failure to mitigate (No. 14), the Policy's exclusions for mere cosmetic damage (No. 16), its provisions that lost or damaged property must be actually repaired or replaced before the Policy provides replacement cost coverage (No. 18), its period of coverage (No. 19), and constitutional challenges to punitive and exemplary damages (Nos. 28, 29, and 30).  Answer at 9-18; *see* Danaby SJ Motion Reply at 2-11.

For reasons that follow, the Court denies Mt. Hawley's motion for summary judgment and grants in part and denies in part Danaby's motion for partial summary judgment.

**A.    A Genuine Dispute of Material Fact Exists as to Whether Danaby Gave Prompt Notice of the Claim.**

Mt. Hawley first moves for summary judgment on the grounds that Danaby did not provide prompt notice of any loss or damage. The parties agree that prompt notice is a condition precedent of coverage under New York law and that Danaby gave notice approximately ninety-seven days after the storm. Mt. Hawley SJ Motion at 16; Opp. to Mt. Hawley SJ Motion at 13; *see Sparacino v. Pawtucket Mut. Ins. Co.*, 50 F.3d 141, 143 (2d Cir. 1995) (stating that "[u]nder New York law, compliance with a notice-of-occurrence provision in an insurance policy is a condition precedent to an insurer's liability under the policy"). They dispute whether Danaby's failure to give notice earlier was reasonable, which is "ordinarily a question of fact precluding summary judgment." *CBKZZ Inv.*, 2024 WL 728890, at *2 (citation modified). "[A] delay in notice may be unreasonable as a matter of law when no excuse for the delay is put forth or the proffered excuse is meritless." *Id.* (citation modified). An insured's notice obligation is triggered when "the circumstances known to [it] . . . would have suggested to a reasonable person the possibility of a claim." *Minasian v. IDS Prop. Cas. Ins. Co.*, 676 F. App'x 29, 31 (2d Cir. 2017) (summary order) (quoting *Sparacino*, 50 F.3d at 143).

Mt. Hawley contends that Danaby learned about covered damage immediately after the storm on April 28, 2023, but unreasonably waited until August 3, 2023, to file a claim. Mt. Hawley SJ Motion at 16-21. Danaby responds that giving notice on August 3 was reasonable because it learned of the covered damage only in late July, when Largo reported to Danaby that he had spotted interior water damage in his ceilings. Opp. to Mt. Hawley SJ Motion at 15; *see* Pl. 56.1 Stmt. ¶ 6.

Danaby also asserts that Mt. Hawley waived its late-notice defense by not including the defense in its disclaimer of coverage. Opp. to Mt. Hawley SJ Motion at 16-18.

Mt. Hawley fails to show the absence of a genuine factual dispute as to when Danaby learned that its Properties may have suffered covered damage. Mt. Hawley argues that the records and testimony establish Danaby's knowledge of a possible insurance claim right after the storm hit. In making this argument, Mt. Hawley puts significant weight on what it characterizes as Sandoval's admission that his employee, Lozano, reported to him that she saw water damage in their office immediately after the storm. Deft. 56.1 Counter Stmt. ¶ 1. The transcript of Sandoval's deposition, however, indicates that he was speaking hypothetically about whether Lozano *would have* alerted him to the kind of water damage depicted in a photo that Largo took months after the storm; he was not describing what actually occurred. Sandoval Dep. Tr. at 61:15-62:14; *see id.* at 62:6-9 ("Q[:] Jos[]y [Lozano] would have noticed [water damage] immediately after your storm and would have brought it to your attention? [Sandoval:] Yes."). Mt. Hawley also points to Danaby's hiring of contractors the same day as the storm and throughout the following weeks, Deft. 56.1 Stmt. ¶ 17; Deft. 56.1 Counter Stmt. ¶ 1, and Sandoval's deposition testimony that tenants "overwhelmed" Danaby's front office with complaints immediately after the storm, Sandoval Dep. Tr. at 63:16-19. According to Mt. Hawley, that circumstantial evidence establishes Danaby's knowledge of the possibility of an insurance claim shortly after the April 28th storm. *See* Mt. Hawley SJ Motion at 20-21.

Danaby offers a different explanation for the repair work and calls from tenants. It says that the roof repairs were routine maintenance and the tenant complaints were mostly traceable to air-conditioning problems, so it had no reason to believe that those issues were caused by wind or hail. Pl. 56.1 Counter Stmt. ¶ 19. While one tenant reported a hallway ceiling leak as early as

27

June 11, Danaby contends that it attributed the leak to an air-conditioning unit, not storm damage, *id.* ¶ 20, as substantiated by a contemporaneous email, Tenant Complaints at 11 (email dated June 11, 2023, describing a "small leak coming from ceiling in hall[]way.  Possible AC issue."). Moreover, Sandoval testified that he only vaguely remembered the April 28th storm and that he could not recall if he was even in the area when it hit, Sandoval Dep. Tr. at 35:21-36:4; Pl. 56.1 Counter Stmt. ¶¶ 17, 29, and Lozano attested that "nothing in the tenant complaints or repair activity suggested . . . that there was widespread or storm-related damage," Lozano Decl. ¶ 6.  In the months after the storm, Sandoval spent just $10,000 on roof upkeep, an amount in the "normal range" of repair work rather than reflecting a need for repairs to remedy damage caused by the storm.  Sandoval Decl. ¶¶ 5, 7.  Additionally, though Danaby's payment records indicate that several contractors were paid out of an account called "Roofing," no evidence has been presented showing whether those contractors were responding to routine matters or were fixing storm-related issues.  Check Register at 20, 22; *see* Sandoval Dep. Tr. at 45:3-46:24, 48:16-49:9.

A reasonable juror could conclude that Danaby's decision to perform work on the Properties' roofs over the summer does not necessarily suggest that the April 28th storm was the reason for that work.  Indeed, Mt. Hawley's partial declination letter reflects how Danaby might have believed that the roof problems were not caused by a storm.  According to that letter, Truitt's initial investigation found "no evidence of wind or hail damage to the roofing system[s]" at any of the Properties, only "minor" hail damage to the power attic vent covers at three of them and the parapet wall cap flashing at one of them, and, though all the sites exhibited interior water damage, "no evidence of a storm created opening that allowed water to enter" at any of them.  Aug. 25, 2023 Letter at 1-2.  If a professional inspector like Truitt concluded that the damage he observed was not attributable to the storm, it was reasonable for Sandoval and Danaby's other employees to

28

have believed the same as they fielded tenant complaints and handled repairs.  Mt. Hawley thus fails to show an absence of a genuine factual dispute as to whether "the circumstances known to [Danaby] . . . would have suggested to a reasonable person the possibility of a claim."  *Minasian*, 676 F. App'x at 31 (quoting *Sparacino*, 50 F.3d at 143).  Given this genuine dispute of material fact as to when Danaby learned of the possibility of a claim, and therefore whether the timing of its claim notice was reasonable, the Court denies summary judgment on the grounds that Danaby failed to give prompt notice.[10]

### B.     A Genuine Dispute of Material Fact Exists as to Whether Mt. Hawley Breached the Policy.

Mt. Hawley alternatively seeks summary judgment on Danaby's breach claim on the grounds that Danaby lacks competent evidence to prove a breach of the Policy.  That is because, according to Mt. Hawley, a reasonable juror cannot conclude that the April 28th storm caused the alleged damage to the Properties.  Mt. Hawley SJ Motion at 24-25.

"Under New York law, an action for breach of contract requires proof of (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *First Invs. Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 168 (2d Cir. 1998) (citation modified). Because Danaby's breach-of-contract claim is based on an insurance contract, Danaby bears the burden of proving that the underlying injury—property damage—falls within the Policy.  *See Amaar Holding Inc. v. Travelers Cas. Ins. Co. of Am.*, 763 F. Supp. 3d 219, 231 (E.D.N.Y. 2025). Mt. Hawley contends that Danaby can prove causation only through expert testimony and asserts

---

[10] As noted, Danaby additionally argues that Mt. Hawley's motion for summary judgment on late-notice grounds should be denied because Mt. Hawley waived any such defense.  *See* Opposition at 16-18.  Because the Court concludes that summary judgment on late-notice grounds should be denied because there is a genuine dispute of material fact as to whether Danaby gave prompt notice, the Court need not consider Danaby's alternative argument for denial.

29

that because it has moved to exclude any testimony about causation by Danaby's designated experts, Danaby would be unable to carry its burden at trial.  Mt. Hawley SJ Motion at 24; *see* Dkt. 76 ("Mt. Hawley *Daubert* Motion").  Similarly, Mt. Hawley argues that Danaby cannot prove damages without expert testimony.  Mt. Hawley SJ Motion at 24-25.

The Court denies summary judgment irrespective of whether expert testimony is necessary in this case to prove causation and damages.  Mt. Hawley has not moved to exclude the damages testimony of one of Danaby's designated experts, David Poynor.  *See* Mt. Hawley *Daubert* Motion at 10-13 (arguing that Poynor's opinion as to causation, but not as to damages, should be excluded).  In addition, Judge Tarnofsky ruled that Danaby's other expert, Largo, may testify as to the scope of damage to the Properties.  *Daubert* Opinion at 37-38.  As for causation, Judge Tarnofsky excluded only Largo's opinion regarding interior water damage.  *Id.* at 40-41.  Poynor may offer his causation opinion.  *Id.* at 47.  There also is evidence suggesting that Mt. Hawley conceded that the storm caused at least some damage, *see* Opp. to Mt. Hawley SJ Motion at 23; Pl. 56.1 Counter Stmt. ¶ 8; *see also* Aug. 25, 2023 Letter at 2; Jan. 26, 2024 Letter at 6, creating the possibility that Danaby might be able to prove causation even without expert testimony.  *See Amaar Holding*, 763 F. Supp. 3d at 232 (noting that experts are not "necessary to establish causation in a property damage case," even if they are normally preferred (citation modified)).

Because Mt. Hawley has failed to show that no reasonable jury could find that the April 28th storm caused sufficient damage to entitle Danaby to recover on its breach-of-contract claim, the Court denies Mt. Hawley's motion for summary judgment on that basis.

## C.    Danaby's Claims Under Texas Law are Cognizable.

The Court also denies Mt. Hawley's motion for summary judgment as to Danaby's claims under Articles 541 and 542 of the Texas Insurance Code.  Mt. Hawley argues that New York law

30

applies to the entire action, rendering Danaby's Texas-law claims not cognizable.  Mt. Hawley SJ

Motion at 15-16, 21-24.  Danaby counters that even if New York law governs the Court's breach-

of-contract analysis, its remaining claims are based on extra-contractual, independent statutory

obligations under Texas law.  Opp. to Mt. Hawley SJ Motion at 20-22.  This prompts another

choice-of-law analysis due to an actual conflict between Texas law, which contains statutory

causes of action for bad faith in handling insurance claims that are distinct from breach of contract,

and New York law, which does not recognize bad-faith refusal to pay as a separate cause of action

from breach of contract.  *See Fin. One Pub. Co.*, 414 F.3d at 331; *Com. & Indus. Ins. Co. v. U.S.*

*Bank Nat'l Ass'n*, No. 07 Civ. 5731 (JGK), 2008 WL 4178474, at *5-6 (S.D.N.Y. Sept. 3, 2008)

(finding an actual conflict between New York and jurisdictions that recognize tort claims for an

insurer's unreasonable denial of benefits).

The law of the forum again guides the Court's analysis.  *See Fin. One Pub. Co.*, 414 F.3d

at 333.  This time, the Court must determine the Policy's choice-of-law clause's scope, not its

validity, to determine whether New York law governs Danaby's extra-contractual claims.  "New

York courts decide the scope of such clauses under New York law, not under the law selected by

the clause, which here also happens to be New York law." *Id.*  Under New York law, "tort claims

are outside the scope of contractual choice-of-law provisions that specify what law governs

construction of the terms of the contract, even when the contract also includes a broader forum-

selection clause." *Id.* at 335.  To be sure, a choice-of-law clause theoretically "could be drafted

broadly enough to reach such tort claims," *id.*, but New York courts are reluctant "to construe

contractual choice-of-law clauses broadly to encompass extra-contractual causes of action," *2002*

31

*Lawrence R. Buchalter Alaska Tr. v. Phila. Fin. Life Assurance Co.*, 96 F. Supp. 3d 182, 211 (S.D.N.Y. 2015) (citation modified).[11]

Choice-of-law provisions vary in breadth. Generally, the "provisions applying [the chosen law] to disputes 'arising out of' or 'relating to' a contract are capacious enough to reach related tort claims, while provisions stating that a contract will be 'governed by' or 'construed in accordance with' the law of a state are not." *Monroe Staffing Servs., LLC v. Whitaker*, No. 20 Civ. 1716 (GBD) (BCM), 2023 WL 4285292, at *10 (S.D.N.Y. June 9, 2023) (quoting *Ramiro Aviles v. S & P Glob., Inc.*, 380 F. Supp. 3d 221, 270-71 (S.D.N.Y. 2019)), *report and recommendation adopted by*, 2023 WL 4249012 (S.D.N.Y. June 29, 2023). Other examples of capacious language include statements like "all issues concerning enforcement of the rights and duties of the parties" and "this Agreement and all claims related to it." *Mayagüez S.A. v. Citigroup, Inc.*, No. 16 Civ. 6788 (PGG), 2018 WL 1587597, at *10 (S.D.N.Y. Mar. 28, 2018) (citation modified). Such provisions may encompass tort claims. *See id.* On the other end of the spectrum are narrow phrases such as "*[t]his Agreement* will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine)." *Fin. One Pub. Co.*, 414 F.3d at 335. One case analyzing the phrase "all questions arising hereunder" concluded that "'[h]ereunder' references only the contract," so "'arising hereunder' is not sufficiently broad to

---

[11] At the time *Finance One* was decided, the Second Circuit could not identify a reported New York case presenting "such a broad clause." 414 F.3d at 335. Mt. Hawley cites a district court case, issued just a week after *Finance One*, which construed a clause stating "all matters arising hereunder" as encompassing an alleged tort—bad faith conduct in handling insurance claims—that was not cognizable under New York law. *Core-Mark Int'l Corp. v. Commonwealth Ins. Co.*, No. 05 Civ. 183 (WHP), 2005 WL 1676704, at *3 (S.D.N.Y. July 19, 2005); *see* Mt. Hawley SJ Motion at 15-16. That case, however, did not mention *Finance One*, nor did it analyze the scope of the choice-of-law clause. *See Core-Mark Int'l*, 2005 WL 1676704, at *3. A more recent case that Mt. Hawley cites also did not consider *Finance One* when analyzing the scope of the choice-of-law provision at issue. *Ram Krishana, Inc.*, 2024 WL 1657763, at *5; *see* Mt. Hawley SJ Motion at 15.

encompass tort claims." *Winter-Wolff Int'l, Inc. v. Alcan Packaging Food & Tobacco Inc.*, 499 F. Supp. 2d 233, 240 (E.D.N.Y. 2007).

The Policy's language, "[a]ll matters arising hereunder," Policy at MTH000236, falls closer to the narrow end of choice-of-law provisions by restricting the scope to "hereunder." On the one hand, it opens with an expansive-sounding "[a]ll matters." *Id.* But as the court in *Winter-Wolff International* observed, the phrase "matters arising hereunder" narrows the set of issues to those emerging out of the contract, without reaching torts incident to the contract. 499 F. Supp. 2d at 240. The Policy does not use language that breaks out of the contract's four corners such as "all issues concerning . . . the rights and duties of the parties" or "all claims related to [the agreement]." *Mayagüez S.A.*, 2018 WL 1587597, at *10 (citation modified). This reading is reinforced by the breadth of the nearby forum-selection clause, which broadly directs "[a]ny litigation" brought by Danaby to be initiated in New York. Policy at MTH000236. "When considered together, the choice-of-law clause and the forum-selection clause use two different formulations with respect to their scope, which distinction this Court is bound to respect." *Bryce Corp. v. XL Ins. Am., Inc.*, No. 23 Civ. 1814 (KPF), 2023 WL 9004039, at *6 (S.D.N.Y. Dec. 28, 2023) (holding that an insurance policy's choice-of-law provision did not encompass a statutory bad-faith claim); *cf. Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010) ("[W]here consideration of the contract as a whole will remove the ambiguity created by a particular clause, there is no ambiguity." (citation modified)). Therefore, "the Court finds that the Policy's choice-of-law provision applies only to those . . . causes of action that sound in contract." *2002 Lawrence R. Buchalter Alaska Tr.*, 96 F. Supp. 3d at 212.[12]

---

[12] The other cases that Mt. Hawley cites in support of its position are distinguishable. *See* Mt. Hawley SJ Motion at 15-16; Mt. Hawley SJ Motion Reply at 3. *Turtur v. Rothschild Registry*

"As the tort claim is not covered by the choice of law provision in the contract, this Court must apply New York's interest analysis which gives controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation." *Winter-Wolff Int'l*, 499 F. Supp. 2d at 240 (citation modified).  Texas has the greatest concern.  The Policy was delivered there, Danaby is based there, the alleged statutory tort is grounded in a Texas statute, and Danaby allegedly suffered injury from that tort in Texas.

Because the Court applies Texas law to Danaby's tort claims, the alleged statutory violations by Mt. Hawley are cognizable.  Under Texas law, "[a]n insured's claim for breach of an insurance contract is 'distinct' and 'independent' from claims that the insurer violated its extra-contractual common-law and statutory duties." *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 489 (Tex. 2018); *see Ortiz v. State Farm Lloyds*, 589 S.W.3d 127, 133-34 (Tex. 2019); *cf. Encalade v. State Farm Lloyds*, Civil Action No. H-24-4310, 2025 WL 3755128, at *6-7 (S.D. Tex. Dec. 29, 2025).  Mt. Hawley does not argue the absence of evidence supporting Danaby's Texas law claims beyond a single conclusory half-sentence at the end of its otherwise unsuccessful argument that the claims are not cognizable under New York law.  *See* Mt. Hawley SJ Motion at 24 ("[T]he evidence shows that Mt. Hawley acted reasonably based on the findings of its retained

---

*International*, 26 F.3d 304, 309-10 (2d Cir. 1994), is inapposite because it applied Texas choice-of-law rules, not New York's.  *See Fin. One Pub. Co.*, 414 F.3d at 333-34 (discussing the choice-of-law analysis in *Turtur*).  Two others concern common-law claims, not statutory ones.  *See CBKZZ Inv.*, 2024 WL 728890, at *3; *Com. & Indus. Ins.*, 2008 WL 4178474, at *3-4.  The courts in *H.S.W. Enterprises, Inc. v. Woo Lae Oak, Inc.*, 171 F. Supp. 2d 135, 141 n.5 (S.D.N.Y. 2001), and *AMVS, Inc. v. Mt. Hawley Insurance Company*, No. 22 Civ. 10782 (ER), 2025 WL 278438, at *6 (S.D.N.Y. Jan. 23, 2025), did not analyze the scope of the contractual choice-of-law clauses in their respective contracts.  And *Ramiro Aviles* held that a choice-of-law clause applied only to the contract and did not encompass statutory fraudulent-conveyance claims.  380 F. Supp. 3d at 270-71 (quoting *Fin. One Pub. Co.*, 414 F.3d at 335).

independent adjuster and professional engineer.").  Mt. Hawley thus does not meet its burden of showing the absence of a genuine issue of material fact as to Danaby's Texas-law claims, so the Court denies summary judgment as to those claims.

The Court reaches one other issue regarding Mt. Hawley's motion for summary judgment. In light of the analysis at *supra* III, the Court finds that Mt. Hawley accurately represented that New York law governs the Policy and that venue would be in New York.  *See* Am. Compl. ¶¶ 25-27 (alleging that Mt. Hawley "misrepresented Texas law to Danaby" by "inform[ing] Danaby that the [P]olicy requires that it is, essentially, immune from Texas Laws and Texas Department of Insurance regulations and that New York laws apply instead," by stating that "New York law would apply and that venue would be in New York," and by advising Danaby that "New York law applies to this dispute"), 33 (alleging that Mt. Hawley violated Texas Insurance Code Section 541.060 by "misrepresenting to Danaby a material fact or policy provision relating to coverage at issue").  In making this finding, the Court exercises its discretion to reach this issue in order to "streamline the litigation process by narrowing the triable issues."  *D'Iorio v. Winebow, Inc.*, 68 F. Supp. 3d 334, 356 (E.D.N.Y. 2014) (citation modified); *see also* Fed. R. Civ. P. 56(g) ("If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case.").  In light of this finding, Danaby shall show cause why the Court should not grant summary judgment in Mt. Hawley's favor as to Danaby's claim that Mt. Hawley exercised bad faith by "misrepresent[ing] . . . a material fact or policy provision relating to coverage at issue."  Am. Compl. ¶ 33; *see* Fed. R. Civ. P. 56(f)(3) (authorizing a court, "[a]fter giving notice and a reasonable time to respond," to "consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute").

**D.    Affirmative Defenses**

Lastly, the Court turns to Danaby's motion for partial summary judgment, seeking dismissal of many of Mt. Hawley's affirmative defenses.  "An affirmative defense can be dismissed on a summary judgment motion when that defense is unsupported by any evidence in the record."  *Lifeguard Licensing Corp. v. Ann Arbor T-Shirt Co., LLC*, No. 15 Civ. 8459 (LGS), 2018 WL 3364388, at *1 (S.D.N.Y. July 9, 2018).  In insurance disputes, "[o]nce an insured has come forward with evidence of a loss covered by the insurance policy, the burden shifts to the insurer to show that the loss is excluded from coverage."  *Jakobson Shipyard, Inc. v. Aetna Cas. & Sur. Co.*, 961 F.2d 387, 389 (2d Cir. 1992).  Mt. Hawley raises the Policy's exclusions as many of its affirmative defenses.  *Cf. Utica Mut. Ins. Co. v. Munich Reins. Am., Inc.*, 7 F.4th 50, 63 (2d Cir. 2021) (defining an affirmative defense as "a defense that will defeat the plaintiff's claim, even if all allegations in the complaint are true, rather than an attack on the truth of the allegations, or a rebuttal of a necessary element of the claim" (citation modified)).

"Where a plaintiff uses a summary judgment motion . . . to challenge the legal sufficiency of an affirmative defense—on which the defendant bears the burden of proof at trial—a plaintiff 'may satisfy its Rule 56 burden by showing that there is an absence of evidence to support [an essential element of] the [non-moving party's] case.'"  *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (alteration in original) (quoting *DiCola v. SwissRe Holding (N. Am.), Inc.*, 996 F.2d 30, 32 (2d Cir. 1993)).  "While whatever evidence *there is* to support an essential element of an affirmative defense will be construed in a light most favorable to the non-moving defendant, there is 'no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim.'"  *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  "After all, in cases where there is an absence of evidence

36

to support an essential element of a defense, with respect to that defense 'there can be "no genuine issue as to any material fact" since a complete failure of proof concerning an essential element of the [defendant's affirmative defense] necessarily renders all other facts immaterial.'" *Id.* at 54-55 (alteration in original) (quoting *Celotex Corp.*, 477 U.S. at 323). "Conversely, if an affirmative defense is supported by evidence from which a reasonable jury could find the defense applicable, then summary judgment must be denied." *Smith v. Interstate Mgmt. Co. LLC*, No. 20 Civ. 10867 (KPF), 2022 WL 4537947, at *10 (S.D.N.Y. Sept. 28, 2022). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation modified). With these standards in mind, the Court turns to the affirmative defenses for which Danaby seeks judgment.

The Court denies summary judgment as to Affirmative Defense No. 2, which asserts the Policy's exclusion of claims that do not exceed its deductible after calculation of coinsurance and depreciation. *See* Answer at 10. Danaby claims to have suffered damage exceeding the Policy's deductible, but Mt. Hawley has proffered admissible expert testimony disputing Danaby's calculations of repair costs, coinsurance, and depreciation. *See* Deft. 56.1 Stmt. ¶ 10. This proffered evidence creates a genuine dispute as to whether Danaby's claim in fact exceeds the deductible.

The Court grants summary judgment as to Affirmative Defense No. 3, which invokes the Policy's coverage limits to cap Danaby's recovery. *See* Answer at 10. Mt. Hawley fails to identify any evidence indicating that Danaby seeks a recovery greater than the Policy's limit. *See* Opp. to Danaby SJ Motion at 15-16. Moreover, Mt. Hawley argues that Danaby's covered losses are too low to hit the deductible, not so high that they exceed the Policy's coverage limit. *Id.* Indeed, Danaby's experts estimate that the total cost of restoring the Properties to their pre-loss conditions

37

would be under $2 million, well below the Policy's coverage limit.  Pl. 56.1 Stmt. ¶¶ 17-18; Dkt. 77, Exh. B (Poynor expert report) at 4.  Danaby also disclaims any demand for damages exceeding the Policy's limits, reinforcing the absence of a genuine dispute as to this issue.  Danaby SJ Motion Reply at 2 (stating there is no evidence "that Danaby is seeking recovery beyond what the Policy permits"); *see also* Dkt. 61 at 2 (Mt. Hawley's pre-motion letter explaining that it "appears [Danaby] has acknowledged that it does not seek damage in excess of applicable policy limits").

The Court denies summary judgment as to Affirmative Defense No. 4, which asserts that the coinsurance formula applies to Danaby's claim.  *See* Answer at 11.  Danaby argues that summary judgment is warranted as to this defense, because the coinsurance calculations depend on the "valuation of the insured properties as of the date of loss," and Mt. Hawley has "no admissible evidence establishing the actual value of the properties" on the date of the storm. Danaby SJ Motion Reply at 3.  That is incorrect.  Judge Tarnofsky ruled that Mt. Hawley's expert, Truitt, is qualified to opine on the Policy's coinsurance provisions and the means by which he obtained the Properties' values.  *Daubert* Opinion at 33-34.  Therefore, there is a genuine dispute as to the Properties' value and consequent coinsurance calculations.

The Court grants in part and denies in part summary judgment as to Affirmative Defense No. 10, which asserts the Policy's provision stating that, for any building with roof surfacing more than fifteen years old, Danaby cannot recover replacement costs for "roof surfacing, including shingles tiles, cladding, metal or synthetic sheeting or similar materials covering the roof, all materials used in securing the roof surface, all materials applied to or under the roof surface for moisture protection, and roof flashing," Answer at 12-13, and instead can recover only "the value of roof surfacing at actual cash value as of the time of loss or damage," Policy at MTH000229. Mt. Hawley concedes that the roofs at the eight Alberta and Nolana Sites are fewer than fifteen

years old.  *See* Opp. to Danaby SJ Motion at 17-18.  Accordingly, the Court grants summary judgment in Danaby's favor on Affirmative Defense No. 10 as to the Alberta and Nolana Sites.

The evidence presented by the parties in connection with their summary judgment motions indicates that the Canton Sites' roofs are more than fifteen years old.  Mt. Hawley's expert, Verhulst, estimates that those roofs were at least twenty years old as of January 2024, and therefore excluded from replacement cost coverage even if Danaby proves that they were damaged by wind and hail.  Verhulst Reports at MTH001771; *see* Opp. to Danaby SJ Motion at 18; *see also* Kotara Dep. Tr. at 88:12-19 (recalling that, based on Mt. Hawley's investigation, the age of the roofs at the Canton Sites was "20 plus years"); Verhulst Decl. ¶ 8 (offering his "opinion that the roof surfaces of the buildings at [the Canton Sites] [were] at least 20 years old as of January 17, 2024").  Danaby does not proffer any evidence to the contrary as to the age of the Canton Sites' roofs.

In an effort to "streamline the litigation process by narrowing the triable issues," *D'Iorio*, 68 F. Supp. 3d at 356, the Court finds, pursuant to Rule 56(g), that the Alberta and Nolana Sites' roofs were below fifteen years old as of April 28, 2023.  Danaby also shall show cause why the Court should not further find, pursuant to Rule 56(g), that the Canton Sites' roofs were more than fifteen years old as of April 28, 2023, and why the Court should not grant summary judgment in Mt. Hawley's favor on Affirmative Defense No. 10 as to the Canton Sites under Rule 56(f)(3).

Various affirmative defenses concern the Policy's exclusions for continuous or repeated seepage or leakage (Affirmative Defense No. 7); wear and tear, deterioration, and faulty or inadequate workmanship, repair, construction, materials, or maintenance (Nos. 8 and 9); and cosmetic damages (No. 16).  *See* Answer at 11-12, 14.  Danaby argues for summary judgment as to these defenses on the grounds that it is not seeking to recover for those kinds of damages.  *See* Danaby SJ Motion at 10-11, 14; Danaby SJ Motion Reply at 4-5, 8-9.  Yet Mt. Hawley's experts

39

assume otherwise, attributing a significant portion of Danaby's claimed damages to causes that may be excluded under the Policy, including, *inter alia*, condensation or leakage from plumbing or HVAC systems, distress consistent with repeated replacement and repair attempts, misaligned and deteriorated wood sleepers below rooftop mechanical units due to age and poor workmanship, and other damage not attributable to wind or hail.  Verhulst Decl. ¶¶ 6-7; *see* Opp. to Danaby SJ Motion at 18-20.  Given this uncertainty, the Court denies summary judgment as to Affirmative Defenses Nos. 7, 8, 9, and 16.

The Court grants in part and denies in part summary judgment as to Affirmative Defense No. 12, which asserts the Policy's exclusion for "loss or damage caused directly or indirectly by the presence, growth, proliferation, spread or any activity of 'fungus' (as defined in the Policy), wet or dry rot, or bacteria."  *See* Answer at 13.  Mt. Hawley has raised a genuine dispute as to whether the exclusion for wet or dry rot covers the damage to the fascia at the Canton Sites.  *See* Kotara Dep. Tr. at 89:12-24; Opp. to Danaby SJ Motion at 20.  It has not proffered any evidence of fungus, rot, or bacteria at the Alberta and Nolana Sites, however.  The Court therefore grants summary judgment in Danaby's favor as to the Alberta and Nolana Sites, dismisses Affirmative Defense No. 12 as it pertains to those Sites, and denies summary judgment on this defense as to the Canton Site.

The Court denies summary judgment as to Affirmative Defense No. 13, which raises Danaby's alleged failure to provide prompt notice of the insurance claim.  *See* Answer at 13-14. For the reasons stated at *supra* IV.A, Mt. Hawley raises a genuine dispute of material fact relating to this affirmative defense.

The Court denies summary judgment as to Affirmative Defense No. 14, which alleges that Danaby failed to take all reasonable steps to protect the Properties after the storm damage.  *See*

40

Answer at 14.  As stated, there is a genuine issue of fact as to when Danaby learned of the storm damage.  *See supra* IV.A.  Mt. Hawley may also introduce testimony that Danaby failed to use tarping and other measures that may have protected the Properties after the storm.  *See* Kotara Dep. Tr. at 90:2-91:21.  Thus, there is a genuine issue of fact as to whether Danaby fulfilled its duty to mitigate damages.

The Court denies summary judgment as to Affirmative Defense No. 18, which invokes the Policy's exclusion for any replacement cost coverage for lost or damaged property that was not actually repaired or replaced, or that was not repaired or replaced as soon as was reasonably possible.  *See* Answer at 15.  It is unclear if Danaby seeks damages for pre-repair or pre-replacement costs.  *Compare* Danaby SJ Motion at 15, *with* Opp. to Danaby SJ Motion at 21.  For example, Danaby has indicated that it seeks coverage for the complete replacement of its roofs, *see* Am. Compl. ¶ 12 (describing need for full roof replacement at the Alberta Sites); Largo Dep. Tr. at 56:21-57:11, but Sandoval testified that no roof has been completely replaced since the storm, Sandoval Dep. Tr. at 50:20-23.  Mt. Hawley has raised a genuine dispute of fact as to whether this exclusion will apply to some of Danaby's claimed damages.

The Court grants summary judgment as to Affirmative Defense No. 19, which provides that the Policy covers loss or damage during the Policy period only.  *See* Answer at 15.  Mt. Hawley does not point to any evidence indicating that Danaby's claimed damages occurred outside the Policy period of August 2022 to August 2023, so there is no genuine dispute of material fact as to this affirmative defense.

The Court grants summary judgment as to Affirmative Defenses Nos. 28, 29, and 30, which raise constitutional restrictions on the exemplary and punitive damages a Court can impose on a defendant.  *See id.* at 17-18. Mt. Hawley acknowledges that it asserted these defenses "[o]ut of an

abundance of caution," and that failure to do so would not prevent it from invoking those arguments later in the litigation. Opp. to Danaby SJ Motion at 22. Of course, "it is well established that there are procedural and substantive constitutional limitations" on damages awards. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003). But Mt. Hawley does not point to any evidence indicating that Danaby seeks excessive exemplary or punitive damages. Accordingly, the Court grants summary judgment as to these affirmative defenses.

Lastly, Mt. Hawley has withdrawn Affirmative Defenses Nos. 5, 11, 15, 17, 22, and 23, and concedes that it has not adequately pleaded Affirmative Defenses Nos. 20 and 21. *See* Opp. to Danaby SJ Motion at 14. Accordingly, summary judgment is granted as to those eight affirmative defenses as well.

## V. Conclusion

For the foregoing reasons, the Court denies Mt. Hawley's motion for summary judgment and grants in part and denies in part Danaby's partial motion for summary judgment. The Court grants summary judgment as to Affirmative Defenses Nos. 3, 5, 11, 15, 17, 19, 20, 21, 22, 23, 28, 29, and 30, grants in part and denies in part summary judgment as to Affirmative Defenses Nos. 10 and 12, and denies summary judgment as to the remainder of Mt. Hawley's affirmative defenses.

Within fourteen days of the date of this Opinion and Order, Danaby shall show cause why the Court should not find pursuant to Federal Rule of Civil Procedure 56(g) that the following fact was established: the Canton Sites' roofs were more than fifteen years old as of April 28, 2023. Danaby also shall show cause why the Court should not grant summary judgment in Mt. Hawley's favor as to (1) Danaby's claim of bad faith based on an alleged misrepresentation that New York law governs the Policy, *see supra* IV.C, and (2) Mt. Hawley's Affirmative Defense No. 10 as to

42

the Canton Sites, *see supra* IV.D.  *See* Fed. R. Civ. P. 56(f)(3).  Mt. Hawley shall respond within fourteen days of Danaby's submission.  Danaby's reply, if any, is due seven days after that.

Also within fourteen days of this Opinion and Order, the parties shall submit a joint letter advising the Court as to whether they seek a referral to either Judge Tarnofsky for settlement discussions or the Court-annexed Mediation Program.  The Clerk of Court is respectfully directed to close Docket Numbers 64 and 67.

SO ORDERED.

Dated: February 17, 2026
New York, New York

_____
JOHN P. CRONAN
United States District Judge